(117 App. Div. 800)

## POMEROY v. NEWELL et al.

(Supreme Court, Appellate Division, Second Department. March 8, 1907.)

SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—OFFER AND ACCEPTANCE.

Plaintiff, in reference to the purchase of certain land owned by defendants, cabled, "Will you accept $50,000 cash, I assuming all liens?—and received the reply, "Will take $60,000 cash above all liens and commissions." Plaintiff then cabled "Will you give thirty-day option at last figures?"—to which reply was made, "Will give thirty-day option. Notify B." (defendants' agent for sale of property). Plaintiff cabled: "Your cable granting option received. Have accepted option. Notified B." *Held*, in an action for specific performance, that the correspondence did not constitute a contract for the sale of the property, but, at most, amounted to a continuing offer to sell.

Appeal from Special Term.

Action by Eugene C. Pomeroy against Julia P. Newell and others. From a judgment dismissing his complaint, plaintiff appeals. Affirmed.

Argued before JENKS, HOOKER, RICH, MILLER, and GAYNOR, JJ.

Archibald Foote Clark (Joseph D. Redding, on the brief), for appellant.

George E. Blackwell, for respondents Newell and Pomeroy.

Henry H. Abbott, for respondent Rickert.

JENKS, J. This is an appeal from a judgment dismissing the complaint in an action for specific performance. In consideration of this disposition, we must remember that such relief is "largely in the discretion of the court" (Dunckel v. Dunckel, 141 N. Y. 434, 36 N. E. 405), and that in Stokes v. Stokes, 148 N. Y. 716, 43 N. E. 211, the following rule was quoted and approved:

"A contract must possess certain elements in order that a court of equity may exercise jurisdiction to compel its performance. 'It must be upon a valuable consideration. It must be reasonably certain as to its subject-matter, its stipulations, its purposes, its parties, and the circumstances under which it was made. It must be, in general, mutual in its obligations and its remedy.' 3 Pomeroy's Eq. Jur. § 1405."

The plaintiff declares upon an agreement to convey lands in the county of Queens possessed by the defendants Mrs. Newell and Miss Pomeroy, who were his aunts. At the time of the alleged agreement the plaintiff was in this county and the said defendants were in France. The husband of Mrs. Newell, George B. Newell, Esq., who was the agent of these defendants, was also in France, and the dealings between the plaintiff and Mr. Newell were by telegraph and by post. The property had been in the family for years, and was well known by all of the parties. It had been the subject of correspondence between them for some time. Mr. Newell had put the property in charge of the law firm of Blackwell Bros., of New York City, who were authorized to sell it, and who were continuously active to make a sale that would be acceptable to their clients. These facts were familiar to the plaintiff.

It appears that the Messrs. Blackwell made a sale of the lands to a third party, which the defendants, in recognition of the Messrs. Blackwell's authority in the premises, felt bound to confirm, and did confirm. It was essential, then, that the plaintiff should establish a prior engagement of the defendants to him, and thus the contest waged about the telegraphic communications before the period that the Blackwells notified the plaintiff of the sale made by them. This was February 15th. On February 9, 1905, the plaintiff had telegraphed to Mr. Newell: "Will give Pomeroy and Newton (or Newell) seventy-five thousand for Astoria property free and clear. Answer." On February 10, 1905, Mr. Newell had telegraphed: "Will take cash above all liens which you must assume." On that day the plaintiff telegraphed to Newell: "Will you accept fifty thousand cash, I assuming all liens?" On February 11th Mr. Newell had telegraphed: "Will take sixty thousand cash above all liens and commissions." On February 11th the plaintiff telegraphed: "Will you give thirty-day option at last figures?" And on February 12th Mr. Newell telegraphed: "Will give thirty-day option. Notify Blackwell." On February 14th the plaintiff telegraphed: "Your cable granting option received. Have accepted option. Notified Blackwell."

The issue as to an agreement was finally defined as to the force and effect of the expression, "Have accepted option"; the plaintiff insisting that thereby he agreed to purchase the property, and the defendants contending that thereby the plaintiff but agreed to establish an option between the parties, whereby, if he offered the stipulated price within 30 days, he would purchase the property. The learned Special Term sustained the defendants, and I am of opinion that its judgment should be affirmed. The determination of the intention is not dependent on the question whether the language used was futile or effective, by this I mean whether the plaintiff thereby did or did not secure an option. If he sought to secure an option and did not, we should not therefore hold that he did not intend to secure it. The agreement for an option and the option are two different things (Ide v. Leiser, 10 Mont. 5, 24 Pac. 695, 24 Am. St. Rep. 17; Black v. Maddox, 104 Ga. 157, 30 S. E. 723; 21 Am. & Eng. Ency. of Law [2d Ed.] 924, 925), and the mere assent to an offer of an option is not a purchase under the option. Chicago & G. E. R. R. Co. v. Dane, 43 N. Y. 240. Otherwise acceptance of the offer of an option would destroy the option by merging it in the purchase. In this case the plaintiff, in order to maintain his legal right, was forced to declare on an agreement to purchase; for, if he stood upon the proposition that the words, "Have accepted option," secured for him an option, he must fail, inasmuch as what the parties supposed was an option was but a mere continuing offer, in that there was no consideration for it, and hence it could be withdrawn at any time before the plaintiff availed himself of it. 21 Am. & Eng. Ency. of Law (2d Ed.) p. 929; Quick v. Wheeler, 78 N. Y. 300–304. See, too, Dickinson v. Dodds, 2 L. R. Chanc. Div. 463; Boston & Maine Railroad v. Bartlett, 3 Cush. 225. And the sale by the Blackwells would amount to such withdrawal. Dickinson v. Dodds, supra. The words, "Have accepted option," have not received a judicial definition from the Court of Appeals so as to warrant the

assumption that the parties had a settled definition in mind. Slocovich v. Orient Mut. Ins. Co., 108 N. Y. 56, •14 N. E. 802. The industry of the learned counsel for the appellant has collected instances of the use of this expression in judicial opinions and in legal headnotes to describe past acts in closing the option. It may be conceded that such uses were accurate; but, on the other hand, instance is not wanting of a use of the same expression in the sense contended for by the defendants in this case. In Chicago & G. E. R. R. Co. v. Dane, supra, Grover, J., for the court, writes:

"Upon the receipt of the defendant's offer to transport not to exceed 6,000 tons upon the terms specified, it merely accepted such offer, and agreed to be bound by its terms. This amounted to nothing more than the acceptance of an option by the plaintiff for the transportation of such quantity of iron by the defendants as it chose; and, had there been a consideration given to the defendants for such option, the defendants would have been bound to transport for the plaintiff such iron as it required within the time and quantity specified; the plaintiff having its election not to require the transportation of any."

We are not limited by legal definition or by rigid meaning, but the question may be answered in consideration of the meaning of the words in the light of surrounding circumstances, of the purpose in mind, and of the end sought. Maloney v. Iroquois Brewing Co., 173 N. Y. 303, 66 N. E. 19; Gillet v. Bank of America, 160 N. Y. 549, 55 N. E. 292.

The parties had failed to make any agreement for immediate purchase, and they were apart as to the purchase price. The defendants demanded more than the plaintiff offered. Thereupon the plaintiff's object was to secure an option, in order, as he says, that he might look into the "taxes, assessments, arrears, and interest." It is to be noted that the plaintiff did not ask for the option, so that an answer of the defendants might constitute a meeting of the minds, nor did he make an offer that he would take an option. He but makes inquiry, "Will you give thirty-day option at last figures?" In Wald's Pollock on Contracts (Williston's 3d Ed.) p. 15, it is said:

"First, we have to consider in particular cases whether some act or announcement of one of the parties is really the proposal of a contract, or only an invitation to other persons to make proposals for his consideration. This depends on the intention of the parties as collected from their language and the nature of the transaction, and the question is one either of pure fact or of construction. Evidently it may be an important one, but due weight has not always been given to it."

Lawson in his article on Contracts, in Cyc. vol. 9, p. 278, says:

"If a proposal is nothing more than an invitation to the person to whom it is made to make an offer to the proposer, it is not such an offer as can be turned into an agreement by acceptance. Proposals of this kind, although made to definite persons and not to the public generally, are merely invitations to trade. They go no further than what occurs when one asks another what he will give or take for certain goods. Such inquiries may lead to bargains, but do not make them. They ask for offers which the proposer has a right to accept or reject as he pleases."

Legally, if the matter had ended with the defendants' statement, "Will give option," the plaintiff would not have been bound, for there was no assent. Notice of a refusal to accept was not required of him. Corning v. Colt, 5 Wend. 254. And, as the parties were not together,

an acceptance must be manifested by some appropriate act. White v. Corlies, 46 N. Y. 467. The purchase involved a large sum, the parties were thousands of miles apart, the communication was by cable which could only be verified by that means, and the defendants had required that Blackwell should be notified. What was more natural than that the telegram offering the "option" should be acknowledged, and that the notification required should be reported as made? If the telegram was to be acknowledged at all, it was but natural that the plaintiff should make some expression of assent to the offer. The words, "Have accepted option," more naturally refer to the acceptance of the "option" than to the purchase of the property. And, in passing, it may be noted that in his telegram of the 16th the plaintiff does not ask the defendants to cable Blackwell "Have accepted option," but to "Cable Blackwell have purchased." It may be that the economy of saving a single word explains the variance, or it may be that the variance in language indicates different ideas. It is natural to the course of business dealing that an acceptance should follow an offer, if one desires to avail himself of the offer, and it is unnatural that such an one, even inviting an offer, should remain without word or action of assent when the offer is made, relying on the fact that the offerer assumes an assent from an invitation. The telegram of Mr. Newell in answer to the inquiry whether a 30-day option would be given was sent from Paris on Sunday, February 12th, and was received on that day, presumably, in Madison, N. J. February 13th was celebrated as Lincoln's birthday, and yet the plaintiff, who had asked for an option of 30 days, which he understood had been given to him, and therefore must then have supposed, for aught that appears, that he had yet 27 or 28 days in which to exercise his right, asserts that on the following day, February 14th, he agreed to purchase the property. He testifies that he asked for the time in order that he might determine the taxes, assessments, arrears, and interest against the property; and he also testifies that he had investigated the matter sufficiently in the time that intervened his receipt of the "option" and the sending of his telegram of February 14th. He does testify to the particulars of his investigation. But one naturally queries the reason which moved the plaintiff to such hot haste. It must be remembered that he had received no intimation from any source that there was any doubt as to his "option." On the other hand, if he intended to secure the "option," it was entirely natural, as I have said, that he should acknowledge promptly the receipt of the offer, and also in the acknowledgment express his acceptance thereof. Specific performance is not decreed unless there be mutuality. Would a court of equity hold the plaintiff upon such language under the circumstances as being sufficiently clear, cogent, and definite to establish an agreement on his part to purchase this property?

The question is: What was agreed upon between the parties before the sale by the Blackwells to a third party? The words and acts of the plaintiff subsequent to the notification which he received from Blackwell cannot be taken as throwing light upon the intent and purpose of the language, "Have accepted option," without carrying in mind that such words were written and such acts were done after the plaintiff had thus been notified and perhaps understood that any theory of

an "option" could not avail him. The learned counsel for the appellant lays stress on the fact that his letter of February 14th to the Blackwells is strong indication of intent and purpose. But the letter is ambiguous and consistent with the plaintiff's supposition that he had secured an option. He wrote: "I take pleasure in informing you that I have acquired the interest of my aunts." This was not the natural expression of one who had agreed to buy the property owned by his aunts. He would have said outright, "I have agreed to purchase, or I have bought the property, or I have purchased the property." The plaintiff reveals himself as somewhat disingenuous. When the question came as to who should take the property, he telegraphed Mr. Newell on March 2d, "Under heavy obligations; am compelled to hold you to contract." And yet, under cross-examination, he admits there were "no specific obligations. I did not refer to pecuniary obligations of any kind. * * * It was a moral obligation." It amounted, he admits, to no more than his intention. The plaintiff's letter to Mr. Newell of February 20th is significant:

"I am writing to inform you that I am now in a position to purchase. * * * My reason for asking a thirty days' option was to enable me to go fully into the matter of taxes, assessments, arrears, and interest which acted as a lien against the property, and I did not feel disposed to assume greater responsibilities in this matter than I could in justice to myself and family undertake."

When asked upon the witness stand, "Your idea in asking an option was to find out first how much the taxes and liens were before you undertook any responsibility, is that so?"—the plaintiff replied:

"I wanted to know how much I had to pay for the property, of course, as near as I could find out. Q. And until you discovered that fact, you did not mean to buy it, did you? A. Not necessarily. By the Court: Did you mean to buy it? That is not an answer. Did you mean to buy it? A. I would have had to decide that afterward. Q. Then you did not mean to buy it, then? [No answer.]"

Mr. Newell appears to have acted throughout with scrupulous fairness, though with predilections for his nephew, this plaintiff. It is impossible for me, after a reading of his entire correspondence, to conclude that he had any other thought in mind than that by the telegrams of February 11th, 12th, and 14th there was no agreement between him and his nephew save for an option to purchase within 30 days, and that he wished to secure such privilege for him if he could do so. In point of law there was not even that, but at most a continuing offer that was legally withdrawn before the plaintiff accepted it.

I advise affirmance, with costs. All concur.