WILLIAM J. LANE, as Executor, etc., of JOHN G. LANE, Deceased, Respondent, Impleaded with JOHN J. ALBERTSON, as Executor, etc., of JOHN G. LANE, Deceased, Appellant, v. ELIZABETH S. ALBERTSON and WILLIAM J. LANE, Individually, Appellants, Impleaded with WILLIAM J. LANE and Others, Members of LANE BROTHERS COMPANY, a Joint Stock Association, Respondents.

*Will — disposition of interests in a copartnership, the assets of which are subsequently transferred to a joint stock association — the interest of the testator in the association does not pass thereunder — what is not a transfer of stock in violation of articles of association providing that no member shall sell or transfer the capital stock without first offering it to the association — right of the beneficiary to elect to take the stock instead of the proceeds — what income passes to the residuary legatee.*

March 21, 1894, John G. Lane and William J. Lane, who were equal partners, entered into an agreement to divide the copartnership business into six equal shares as follows: Two shares to William J. Lane in trust for his minor son Silas; two shares to George Lane, a son of William J. Lane; one share to John M. Janes and one share to John G. Lane to be given to whomsoever he willed. The agreement was to be fulfilled within an extreme period of five years from May 1, 1894, pending which, the copartners were to draw out $20,000 a year from the firm business, if not detrimental thereto, but even if the total of $100,000 could not be taken out before the expiration of the five years, the transfer of the business was still to be then made. The agreement further provided that the new holders must obligate themselves on the completion of the $100,000 payment to continue to pay for three years longer $5,000 annually to the said John G. Lane and William J. Lane or their representatives.

In March, 1897, John G. Lane made a will, the 14th and 15th clauses of which provided as follows: "14th. If I should die before the consummation of the agreement made by myself and brother William J. Lane for the disposal of our firm's business, said agreement taking effect May 1st, 1894, and to be consummated May 1st, 1899, I direct my executors to adhere to the spirit if not possible or advisable to follow the exact letter of the agreement, that injustice may be done to no one. 15th. I further direct that on the consummation of the agreement named, the one-half of my share therein mentioned, that is to say, the half of my one-sixth share, go to my brother, William J. Lane, his heirs or assigns. This has been my intention if I lived, and I desire it carried out in case of my death previous to the consummation of said agreement."

The will contained a residuary clause so that there would have been complete testacy even though the 14th and 15th clauses had been omitted.

In May, 1898, prior to which time the sum of $100,000 fixed by the agreement had been withdrawn from the partnership business, articles of association were entered into between John G. Lane, William J. Lane, George Lane and

John M. Janes, whereby they formed a joint stock association to which John G. Lane and William J. Lane deeded and transferred all the firm property. The capital stock was divided into 600 shares, of which William J. Lane received 200 shares, George Lane, 199 shares, John M. Janes, 100 shares and John G. Lane 101 shares.

John G. Lane died in May, 1899, leaving the 101 shares of stock and an estate of more than $200,000.

*Held,* that William J. Lane was not entitled to any interest in the shares of the joint stock association of which John G. Lane died possessed;

That the provision made by the 14th and 15th clauses of the will was subject to a condition precedent that the testator should die before the consummation of the agreement for the disposal of the business of the firm, and that, as the consummation occurred in the lifetime of the testator, the conditional bequest was ineffective;

That the 14th and 15th clauses of the will were simply a statement of the testator's intention to make a gift of one-half of his share in the business to William J. Lane if he lived to see the consummation of the agreement, and that, as he had lived for almost a year after the consummation of the agreement without, so far as appeared, attempting to make the gift, such intention could not be given effect;

That, it appearing that the executors were directed as follows: "To pay all my just debts, make collections, to sell or reinvest securities as may seem necessary," and that all of the debts and legacies of the testator had been paid, a sale of the stock should not be ordered against the protest of the residuary legatee who desired to take the same in specie;

That a clause in the articles of association providing, "No member of the association, nor his executors, administrators or other legal representatives, shall sell or transfer any of the capital stock of the association held by him or them, without first offering the same for sale to the association, or, if it decline the option, to a member thereof at a price not exceeding the appraised value of such stock at the time of such offer, determined and recorded as aforesaid," did not make it obligatory upon the executors to sell the stock as such provision did not require a sale in the event of the death of one of the members, but simply provided that if a sale should be made, the association or a member thereof should have the first opportunity to buy;

That the mere delivery of the stock to the residuary legatee by the executors was not a transfer within the meaning or intent of the provision in question;

That all the income of the estate not otherwise disposed of would pass under the residuary clause.

APPEAL by the plaintiff, John J. Albertson, as executor, etc., of John G. Lane, deceased, and by the defendants, Elizabeth S. Albertson and William J. Lane, individually, from portions of a judgment of the Supreme Court, entered in the office of the clerk of the county of Dutchess on the 13th day of May, 1902, upon the decision

of the court rendered after a trial at the Kings County Special Term.

*Frank B. Lown* for the defendant, appellant, Elizabeth S. Albertson.

*Robert F. Wilkinson,* for the defendant, appellant, William J. Lane, individually, and for the defendants, respondents.

*Allison Butts,* for the plaintiff, respondent.

JENKS, J. :

The first question is whether William J. Lane is entitled under the will to any interest in the shares of stock in Lane Brothers Company owned by the testator. This requires construction of the 14th and 15th clauses of the will which read as follows : " 14th. If I should die before the consummation of the agreement made by myself and brother William J. Lane for the disposal of our firm's business, said agreement taking effect May 1st, 1894, and to be consummated May 1st, 1899, I direct my executors to adhere to the spirit if not possible or advisable to follow the exact letter of the agreement, that injustice may be done to no one. 15th. I further direct that on the consummation of the agreement named, the one-half of my share therein mentioned, that is to say, the half of my one-sixth share, go to my brother, William J. Lane, his heirs or assigns. This has been my intention if I lived, and I desire it carried out in case of my death previous to the consummation of said agreement."

The testator, John G. Lane, and his brother, William J. Lane, equal partners, agreed to divide their business into six equal parts or shares to be held as follows : William J. Lane, two shares in trust for his minor son Silas ; George Lane (a son of William) two shares ; John M. Janes, one share ; John G. Lane " 1 share to be given to whomsoever he will." The agreement, dated March 21, 1894, was to be fulfilled within an extreme period of five years from May 1, 1894. The firm was to continue meanwhile, and to draw out $20,000 a year for five years if not detrimental to the business, but if the total of $100,000 (*i. e.,* $20,000 a year for five years) could

be taken out before the expiration of the five years, then immediately the transfer of the business was to be made. It also provided that the new holders must obligate themselves on the completion of the $100,000 payment to continue to pay for three years longer $5,000 annually to said Lane Brothers or their representatives. In March, 1897, the testator made his will. After bequeathing many legacies, he provided: "13th. I herewith give and bequeath the balance and residue of my estate to my step-daughter, mentioned above, Elizabeth S. Albertson, her heirs or assigns. * * * And I would further request that when the time arrives for disposing of the principal residuary she turn it over to some charitable purpose, that it may continue a perpetual blessing. These requests regarding the expenditure of a part of the residuary income and final disposing of the principal are not obligatory, and a failure to follow them would not invalidate the gift, which is absolute. I believe, however, it will be only a pleasure of the recipient to carry out my wishes." Then follow the said 14th and · 15th clauses, heretofore quoted.

During the life of the testator it was found that the business of the said firm of Lane Brothers justified the withdrawal of the $100,000 reserved by Lane Brothers before the expiration of the five years' limit, and, therefore, in May, 1898, articles of association were entered into between John G. Lane, William J. Lane, George Lane and John M. Janes, whereby was formed the joint stock association of Lane Brothers Company, and John G. and William J. Lane deeded and transferred all the property of their firm to that company. The capital stock consisted of 600 shares of $100 each, divided as follows: William J. Lane, 200 shares; George Lane, 199 shares; John M. Janes, 100 shares; and John G. Lane, the testator, 101 shares. It is seen that William J. Lane took the stock in his own right, and not as trustee for Silas, as contemplated by the agreement. John G. Lane, the testator, died in May, 1899, possessed of the said 101 shares of stock, and leaving, independent of the stock, an estate of more than $200,000.

In *Langdon* v. *Astor's Executors* (16 N. Y. 9, 25), DENIO, Ch. J., said: "There is no principle in the law which forbids the making of testamentary gifts dependent upon the happening or not happening of any event in the future, whether in the testator's lifetime

or afterwards." (See, too, *Damon* v. *Damon*, 8 Allen, 192.) No precise words are required to constitute a condition precedent or subsequent, but the character thereof is determined by the intention of the testator. (*Towle* v. *Remsen*, 70 N. Y. 303, 311; *Finlay* v. *King's Lessee*, 3 Pet. 346, 374.) In the latter case, MARSHALL, Ch. J., said: " It was admitted in argument, and is certainly well settled, that there are no technical appropriate words which always determine whether a devise be on a condition precedent or subsequent. The same words have been determined differently, and the question is always a question of intention. If the language of the particular clause or of the whole will shows that the act on which the estate depends must be performed before the estate can vest, the condition is, of course, precedent; and, unless it be performed, the devisee can take nothing. If, on the contrary, the act does not necessarily precede the vesting of the estate, but may accompany or follow it, if this is to be collected from the whole will, the condition is subsequent." (See, too, 2 Redf. Wills [3d ed.] 242, 302, 304; Rop. Leg. [2d Am. ed.] 747 *et seq.*; 2 Thomas Estates Created by Will, 1094.)

The learned Special Term adjudged that William J. Lane was not entitled to any interest in the said shares, and I think that this part of the judgment should be affirmed. The provision made by the 14th and 15th clauses is conditional upon the death of the testator before the consummation of the agreement for the disposal of the business of the firm, and also upon such consummation, and I think that such conditions are precedent. As the consummation was brought to pass in the lifetime of the testator, the conditional bequest to William J. Lane is ineffective. It is contended by the learned counsel for William J. Lane that the intent is to make an absolute bequest to his client of one-half of the share of the testator in the said business. It is urged that this intent is manifest if the words of the bequest are read with the language, " This has been my intention if I lived, and I desire it carried out in case of my death previous to the consummation of said agreement." The will, aside from the 14th and 15th clauses, is a complete disposition of the entire estate, as it contained a sufficient and effective residuary clause (*Morton* v. *Woodbury*, 153 N. Y. 243), and, therefore, the construction of the learned counsel is not the alternative of partial

intestacy. The testator did state in the will an intention to make a gift if he lived to see the consummation of the agreement. But he did live to see it, and for almost a year thereafter. He received and held the stock, and yet for aught that appears he did not so much as attempt to make the gift, though nothing hindered. Thus he wrote in his will of an act intended to be done during lifetime, if possible, and yet when it became possible he did nothing. Yet the bequest by will was subject to a condition precedent made in terms to happen after the death of the testator, but which could not happen then, because in the course of events it happened during the life of the testator. I cannot construe the will against the plain terms to free the bequest from its expressed condition because of an intention written therein to make a gift *inter vivos* of the subject-matter. It can, of course, be argued that the testator neglected to alter his will so as to express his intent. But the argument is of little force when we consider, in view of what the intent was as expressed, that such "neglect" was not a neglect of the testator to change the will so as to accomplish by will that which he intended to bring about by will, but neglect to act in his life, and consequently not by will. He did not alter the will, and we cannot. In *Hurlbut* v. *Hutton* (42 N. J. Eq. 15) the testator wrote : " I am about conveying to Mrs. Henrietta Hutton, wife of my son, Charles G. Hutton, the house and lands at Bilhere as now occupied by my son, for her separate use and benefit." The chancellor held that this was a mere expression of intention to grant by deed or other appropriate conveyance *inter vivos*, and that it could not be construed as a devise, citing many authorities. (See, too, *Ash* v. *Ash*, 10 Jur. [N. S.] pt. 1, 142; *Matter of Vowers*, 113 N. Y. 569, 571; *Bradhurst* v. *Field*, 135 id. 564, 568; *Goodwin* v. *Coddington*, 154 id. 283, 286.) It is also said that it is unreasonable to suppose that the testator meant that the legacy should be defeated by the happening in his lifetime of the very event upon which he made it depend. But the intention was expressed when the will was made, and that will was ambulatory and ineffectual during his life. (*Burnham* v. *Comfort*, 108 N. Y. 535, 539.) This suggestion does not take into consideration that men change their minds, and that possibly within the year that intervened the making of the will and its effect, caprice or matters of moment worked a change

of mind in the testator. One suggestion occurs to me which may explain that which does not legally require explanation. The agreement for a change from copartnership to association was made in 1894. By its terms William J. Lane was to take two shares *in trust for his minor son.* The will was made in March, 1897. The agreement was carried out in May, 1898. Under it William J. Lane took the stock in his own right, not as trustee. Possibly, when the testator made his will, his state of mind *then* was to give to William an interest in the business in his own right which he otherwise was not to have. But William, subsequent to the execution of the will, and consequently to this inclination of his brother, decided to take and did take the shares in his own right. He thus took what he was not to take under the agreement, an interest similar to that which the testator once intended to give him by gift *inter vivos.* Therefore, there was no reason and perhaps no inclination for John G. Lane to give to him what he already had. Of course, this is conjecture, for all we know is that the testator did not do what he could have done and what he once said he intended to do. In *Hurlbut* v. *Hutton (supra,* 29) the chancellor said that " The testator merely said that he meant soon to convey the property to his daughter-in-law. He lived for several years afterwards and never made the gift. The presumption is that he changed his mind in reference to the matter. But whether he abandoned the design or not is of no consequence. It is enough to say here that he did not devise the property to the daughter-in-law."

I think that there is no force in the suggestion that the testator himself made the condition impossible. He did not. At the time he made the will he was under an agreement which, by its terms, became operative through the prosperity of the firm. He could not foresee the tenure of his life, he could not forecast the future of his trade. He, therefore, did not express a condition which was preposterous or one that he knew that he could render impossible.

The second question is whether the said shares of stock should be sold. One executor insists upon a sale and the other opposes it. I shall examine this question, *first,* with reference to the will; and, *second,* in view of the articles of association of Lane Brothers Company. *First,* as to the will. The testator does not absolutely authorize, much less direct, a sale of the personalty. The 16th clause

# 614 LANE v. ALBERTSON.

reads : " I hereby appoint as my executors my brother William J. Lane, of Poughkeepsie, N. Y., and John J. Albertson, of Magnolia, New Jersey, who shall not be required to give bonds in the execution of the trust. I direct them to pay all my just debts, make collections, to sell or reinvest securities as may seem necessary and to sell at public or private sale any real estate of which I may be possessed at the time of my death; and in short perform all other necessary acts to fulfill and settle this my last Will according to law." The power of sale over personalty is to pay all just debts, make collections, to sell and reinvest securities *as may seem necessary*. It may be noted that the power to sell the realty is not thus limited. It does not appear that the sale is necessary ; on the contrary, both executors plead that all of the debts and legacies have been paid and that the stock remains unadministered. There is no conversion worked by the limited power expressed in the will. (Perry Trusts [5th ed.], § 448, note a, and authorities cited.) Further, the sole residuary legatee, an adult who takes the residue free from subjection to life estate or other charge, protests against the sale, and prays to take the stock, which seems a valuable investment, *in specie*. So far as the will is concerned, there being neither direction nor necessity for conversion, no trust created, and none in interest save this legatee, her prayer should prevail. The title of the personalty is in the executors, but in the language of LANDON, J., in *Steinway* v. *Steinway* (163 N. Y. 183, 200), it is " an administrative title, such as executors usually have to the personal property of their testator, for the purposes of administration, good against all the world except the beneficiaries, but as to them a mere aid and instrument to pass it forward to them in the due course of administration as the law and the will appoints*, free and clear of further needs or liens of the estate." (See, too, *Blood* v. *Kane*, 130 N. Y. 514, 519 ; *Thomson* v. *Hill*, 87 Hun, 111, 114; affd., 155 N. Y. 677.) Now that the debts are paid, the executors are mere trustees, charged with the sole duty to collect, convert and distribute. When this is done, their trust ceases. (*Ledyard* v. *Bull*, 119 N. Y. 62.) It does not appear that there is aught to collect, or that there is necessity to convert. All that remains, then, is to distribute the residue to the sole residuary legatee. Though the title of the executors does not

---

* *Sic.*

pass until the settlement of their accounts, that is but the formal relinquishment which may be required of them by the courts.

In *Mellen* v. *Mellen* (139 N. Y. 210) the principle applied was that where by a will the money was directed to be laid out in the purchase of land for beneficiaries, or land is directed to be sold and the proceeds distributed, it is competent for the parties beneficially interested, if of full age and the gift is immediate and not in trust, to take the money in one case and the land in the other; and ANDREWS, Ch. J., says that the doctrine is founded on the presumption that such power is given by the testator for the benefit and convenience of the devisees and legatees, and, unless made so in terms, was not intended to prevent the beneficiaries from taking his bounty except in the precise form in which the property would exist after the conversion.   I think that the reason for the rule is applicable in the case at bar, and may be applied (*Cook* v. *Lowry*, 95 N. Y. 103, 111), the essential fact being that the sole beneficiary, who is free to take, elects to take *in specie*, and so declares against a conversion, neither directed nor required under the terms of the will. (*Craig* v. *Leslie*, 3 Wheat. 563; *Reed's Estate*, 82 Penn. St. 428; *Wood's Administrator* v. *Wood's Devisees*, 1 Metc. [Ky.] 512; *Hester* v. *Hester*, 3 Ired. Eq. 9.)   We are not without authority of statute.   Shares of stock are personal property within the broad meaning of that term.   (*Weaver* v. *Barden*, 49 N. Y. 286; *Matter of Jones*, 172 id. 575; Morawetz Corp. [2d ed.] § 225, and authorities cited.)   Section 2744 of the Code of Civil Procedure provides : "In either of the following cases, the decree may direct the delivery of an unsold chattel or the assignment of an uncollected demand, or any other personal property to a party or parties entitled to payment or distribution, in lieu of the money value of the property : 1. Where all the parties interested, who have appeared, manifest their consent thereto by a writing filed in the surrogate's office.   2. Where it appears that a sale thereof, for the purpose of payment or distribution, would cause a loss to the parties entitled thereto.   The value must be ascertained, if the consent does not fix it, by an appraisement under oath, made by one or more persons appointed by the surrogate for the purpose."

Again, if it be necessary in such a case as this the court should be astute to find the intent of the testator that the legatee should take

*in specie.* We have seen that the testator, after the specific bequests, leaves all the rest and residue of the estate to Mr. Albertson and that there is no direction for sale of the personalty, and, indeed, no power of sale over the personalty save " as may seem necessary." In a case where even the application of the rule of *Howe* v. *Earl of Dartmouth* (7 Ves. Jr. 138) was discussed (and the rule can have no application in this case for the reason that there is no estate or interest charged upon the residue) GRAY, J., says that a direction to sell only in the event of the necessity to pay debts was significant of an intent that the securities should be retained *in specie.* (*Matter of James*, 146 N. Y. 78.)

*Second.* Are the executors bound to sell the stock pursuant to and in accord with article 9 of the association articles, or, to put the converse, is the residuary legatee prohibited from keeping the stock ? Article 9 reads as follows : " No member of the association, nor his executors, administrators or other legal representatives, shall sell or transfer any of the capital stock of the association held by him or them, without first offering the same for sale to the association, or, if it decline the option, to a member thereof at a price not exceeding the appraised value of such stock at the time of such offer, determined and recorded as aforesaid." Lane Brothers Company is a joint stock association, organized under the laws of the State of New York. Such an association is well defined in Lindley on Partnership (Ewell, 2d Am. ed., § 6) as " consisting of many persons having transferable shares in a common fund," and the same writer says (Chap. 5) that the principal difference between a copartnership and a joint stock association is that there is in the latter, as a rule, no *delectus personarum,* and a transfer of the shares or the death of a member does not dissolve it. In *People ex rel. Winchester* v. *Coleman* (133 N. Y. 279) FINCH, J., says that *People ex rel. Platt* v. *Wemple* (117 id. 136) shows very forcibly how almost the full measure of corporate attributes has, by legislative enactment, been bestowed upon joint stock associations " until the difference, if there be one, is obscure, elusive and difficult to see and describe," and proceeds to point out that the essential difference lies in the fact that a corporation drowns the individual rights, while the association leaves the individual rights unimpaired in that the common-law liability for debts remains unchanged and unimpaired.

In the case referred to (*People ex rel. Platt* v. *Wemple*), the court, per DANFORTH, J., say : "Nor is the principal question altogether new. In *Waterbury* v. *Merchants' Union Express Company* (50 Barb. 158) the nature and legal character of the defendant, a joint stock association, created in like manner with the one before us, was held to have all the attributes of a corporation and all its incidents except a common seal. The statutes, from 1849 to 1867 (*supra*),* were examined and held to confer the qualities which distinguish a corporation from a partnership and to establish the relations of a member of the association as those of a stockholder in a corporation, and not those of an individual in a partnership, and that, in controversies affecting them, the analogies afforded by laws and jurisprudence in the case of corporations should be followed, and not those derived from a simple partnership." And in the *Waterbury Case* (*supra*) the court say : "Their property or capital is represented in shares and certificates of stock, differing in no respect from shares and stock certificates in corporations. * * * It may very well be that in a case of actual insolvency the shareholder, in view of his contingent liability, should have a quicker remedy to wind up and close the concern than the statute laws of this State allow in the case of corporations other than those organized for banking purposes. (See 2 Edmonds' Stat. 484.) Be this as it may, it is, nevertheless, true that the situation and relations of a shareholder in one of these associations are in other respects like, and very exactly like, those of a stockholder in a corporation." I think that in this case we should hold that so far as the interest of the testator in the association is concerned, it is analogous to that of a shareholder in a corporation. There is no contention that the testator did not have the power to dispose of his shares by will. Article 6 provides that the death of the stockholder or the transfer of his shares shall not work a dissolution, and article 9 expressly takes cognizance that the shares may either be held by a member or his executor or administrator. And if such contention had been made, it would, in my judgment, be against public policy, for the reason stated in the learned opinion of BARKER, J., in *Fisher* v. *Bush* (35 Hun, 641), that "The right of transfer is a right of property, and if another has the arbitrary power to forbid

---

* Laws of 1849, chap. 258; Laws of 1851, chap. 455; Laws of 1853, chap. 153; Laws of 1854, chap. 245; Laws of 1867, chap. 289. — [REP.

a transfer of property by the owner, that amounts to annihilation of property." It would be absurd to contend that the force of the 9th article is that Mr. Lane could not bequeath his shares by will without giving the association or its members an opportunity to buy them. It may be noted that the decision in *Matter of Petition of Argus Co.* (138 N. Y. 557, 572) proceeds without question upon the theory that the bequest of the shares by will was entirely within the power of the testator. The article does not require a sale, but if sale is made, that *then* the association or a member shall have the first opportunity to buy. The word " transfer " is not used in a technical sense of changing the name of the owner upon the books of the company, but in the sense of a change of ownership in the property. In *Sands* v. *Hill* (55 N. Y. 18, 22), FOLGER, J., says : " There is no meaning of the word transfer which carries the idea of an act of extinction; or any other idea than that of the bearing over of a right or title or property in a thing from one to another." (See, too, *Robertson* v. *Wilcox*, 36 Conn. 426.) Thus in article 6 the word is used in this sense, *i. e.*, the death of a stockholder or " the *transfer* " of his stock shall not work a dissolution. The mere delivery of the stock to the residuary legatee by the executor is not a transfer within the meaning or intent of the provision, because the executors do not hold the stock in their own rights, but hold the legal title for administrative purposes for the benefit of the residuary legatee. (*Steinway* v. *Steinway*, *supra ;* *Blood* v. *Kane*, *supra ; Schultz* v. *Pulver*, 11 Wend. 363.) In *Blood* v. *Kane* (*supra*) the court, per FOLLETT, Ch. J., say : " It is a universal rule that when the purpose of a trust has been fully accomplished the title or estate of the trustee is at an end, and if he is also entitled to the beneficial estate, the two estates, meeting in the same person, are merged, and he becomes vested in his own right with the entire interest in the property."

As the executors declared that all of the debts and all of the legacies (save, of course, as to this disputed claim of William J. Lane) have been paid, and the shares remain unadministered, their " administrative title " to the personalty is at end, and, therefore, the personalty which falls within the residue must be handed over to the residuary legatee. But this act is not a sale or a transfer by the executors to the residuary legatee in the sense that one

acquires and the others relinquish a property right in the stock, for the property right of the legatee is derived from the will of the testator, and is not acquired from a transfer by the executors of the legal title vested in them for administrative purposes. The title vested in the executors is sufficient to make that sale to a third party valid, but does not give to a transfer of the legal title to their beneficiary the character of sale. The transfer referred to in the 9th article does not mean that there must be a sale, that is, a parting with her interest by the true owner, whose title was from the will, if she seeks to have her stock, when discharged from the administrative title of the executors, transferred to her on the books of the company, for if such be the construction of the article, it would require a sale when there was no intent to sell, but simply to take a step in further assurance of her title. The fact that the stock was transferable only on the books of the company, in person or by attorney, on the surrender of the certificate, if in accordance with the articles, merely "regulated the relation, * * * but did not operate to prevent the vesting of the legal title." (*Matter of Petition of Argus Co., supra; Chemical National Bank* v. *Colwell,* 132 N. Y. 250.)

There is a discrimination to be made between the case at bar and *Scruggs* v. *Cotterill* (67 App. Div. 583). In the latter case the agreement provided for a sale from one party to another if either offered the stock for sale, and in case of the death of either party such a sale *was provided for.* The distinction is that a sale was required by the terms of the agreement, and that "the devolution of property by will * * * is subject to the just obligations of the testator." In *New England Trust Co.* v. *Abbott* (162 Mass. 148) the decision turned upon a contract which the court construed to mean that whenever a stockholder desired to sell, he must sell to the association, and upon his death his executors *should* sell in the same fashion.

As to the dividends, the rule is (to ascertain the amount of a general residue) that all the income of the estate not otherwise disposed of must be added to the residue. In *Matter of Accounting of Benson* (96 N. Y. 499, 511) the court say : "Ordinarily this is not important as to the interest upon the residue, as both principal and interest go to the same parties. But whenever it is important to

any one, the residue should be thus ascertained." I think that that part of the judgment which requires the executors to sell the stock is erroneous and should not stand. I, therefore, advise that the judgment, so far as it determines that William J. Lane is not entitled to any interest under the 14th and 15th clauses of the will, be affirmed, but so far as it determines that the executors should sell the said stock, be reversed.

GOODRICH, P. J., BARTLETT, WOODWARD and HIRSCHBERG, JJ., concurred.

Judgment modified in accordance with opinion of JENKS, J., and as modified affirmed, without costs.