Percy D. Stoddart, J.
In the complaint the plaintiff demands judgment setting aside a transfer of stock from Jessie Margaret Will, as administratrix of the estate of David Will, to Charles E. Ward, for specific performance of an alleged agreement giving the plaintiff the option to purchase said stock, for an accounting to the corporation £ ‘ for a just and proper proportion of the sale price on said sale- and assignment, and of the profits of the business of said defendant Charles E. Ward equitably to be allocated to said corporation ”, for damages for conversion of corporate assets, for a permanent injunction restraining thé defendants from doing various acts. That prayer for relief is based upon two causes of action, one containing allegations relating to the violation of an agreement for the sale of stock, and the other, allegations of waste and misconduct in the handling of the corporation’s business,
*685 The evidence reveals that in 1929, three men, David C. Will of Great Neck, N. Y., Clarence Monroe of Manhasset, N. Y., and John J. Eairden of Mineóla, N. Y., formed a corporation, Manhasset Civil Engineers, Inc. The certificate of incorporation is silent as to the business area of the corporation. It provides merely that the office should be located in the town of North Hempstead, Nassau County, New York. At the first meeting of the incorporators, the office was fixed at 150 Piándome Road, Manhasset, N. Y., and it was in the Manhasset section that the principal business of the corporation was obtained. The amount of capital stock was $11,000, consisting of 1,000 shares of preferred stock with a par value of $10 a share and 100 shares of common stock, also valued at $10 a share. D. C. Will, who had maintained and continued to maintain an office in Great Neck, received all of the preferred stock in return for the use of his records, surveys, and his guarantee to various title companies of the surveys to be made by the corporation. He received 52 shares and Monroe and Eairden each received 24 shares of the common stock.
On the same day that the certificate of incorporation was signed by the three men, they entered into a separate agreement with respect to the disposition of their stock in the event of a withdrawal of a party from the corporation. The agreement provided in part as follows:
“ The parties further agree that in the event that either of them wish to withdraw from the corporation that the remaining two members shall and hereby are given option to buy the stock of the person so withdrawing on the following basis:
‘ ‘ At any time during the first year at par, at any time during the second year on the basis of Twelve Dollars and Fifty Cents ($12.50) a share, at any time during the third year on the basis of Fifteen ($15) Dollars a share and at any time thereafter on the basis of Twenty ($20) Dollars a share.
“ The said D. C. Will agrees that in the event of his withdrawing that the other parties to this agreement shall have the right to purchase the preferred stock held by him at par less such amounts as may have been received by said Will from said corporation in the way of dividends, either on the common or on the preferred stock. All of said options to run for Ninety (90) days after person desiring to withdraw has announced his intention of severing connections with the corporation.
“ In the event that any of the parties hereto shall die owning stock in the corporation, it is agreed that the same option shall exist in favor of the survivors as that herein above set forth, *686 except that the option to purchase said preferred stock shall continue for one year after the death of the owner of said preferred stock.
“ It is further agreed that all records and data obtained by the corporation shall be and remain the property of the corporation and that no officer or employee shall be entitled to copy or employ said records in any business other than that of the corporation.
'‘ This contract shall be binding upon the parties hereto, their heirs and assigns forever.”
In December, 1936, Monroe withdrew from the corporation and his 24 shares were purchased by the corporation. At a meeting of the stockholders on March 30, 1939 it was decided that the corporation “sell to Mr. Spencer Peets of Great Neck, New York, 24 shares of common stock for $480.00. The stock to be issued upon receipt of amount stated, subject to conditions as stipulated in the original corporation stock agreement ’ ’ and Spencer Peets was also elected a director. A similar resolution to issue stock to the plaintiff Peets was adopted at the meeting of September 5, 1940, and on December 27, 1940, the plaintiff paid for the shares by check. No certificate for the 24 shares of common stock was ever issued or delivered to the plaintiff. In the minutes of the meeting held on September 4, 1941, there is found the first and only reference to Mr. Peets as a stockholder. At a special meeting of the directors on January 8, 1942, it was decided that the corporation would purchase Mr. Eairden’s 24 shares of stock. The presence of the plaintiff at that meeting was not noted. The minutes do refer to a discussion concerning the attempt by Eairden to sell his stock to persons who were not stockholders, and provide -“ It was decided that no stockholder would be allowed to sell his stock or any part thereof to a person who is not a member of the corporation without first giving’ the members of corporation an option to buy his stock, said option to run for 90 days. ’ ’ There is no record of any subsequent meeting of the stockholders or directors. In the minute book, several references are made with respect to the status of Charles E. Ward. The meeting of stockholders was adjourned on September 2,1937, because “ the third member of the corporation, Mr. Charles E. Ward was unable to be present. ” At the meeting of stockholders on January 26, 1938, reference is made to the presence of Mr. David C. Will, Mr. John J. Eairden and Mr. Charles E. Ward “ all the stockholders in the company.” At all subsequent meetings of the stockholders, Ward is referred to as a stockholder, including the *687 meeting of September 4,1941, at which the plaintiff was present. The stock transfer book contains an entry of the transfer of shares of common stock to Charles E. Ward. The book containing the certificates of common stock has stubs disclosing the surrender by David C. Will of his 52 shares of common stock and the issuance of a certificate for 27 shares to Will and another certificate for 25 shares to Ward. The certificate issued in the name of Charles E. Ward and the afore-mentioned stub are dated August 8, 1935.
In January, 1942, the plaintiff left New York to work in Norfolk, Virginia, for Levitt Bros, (well-known Long Island builders) who were engaged in a large housing project in the Norfolk area. In 1943, he entered the United States Navy. The business of the corporation during the years of the plaintiff’s absence was carried on by D. C. Will, until Will’s death on March 30, 1944, from which date Ward was active in conducting the business.
On May 22, 1945, the plaintiff, while stationed at San Francisco, California, was advised by a letter from the attorney for Mrs. Will that the latter had decided to convey to Ward all of her late husband’s engineering business, including “ whatever interests Mr. Will had in Manhasset Civil Engineers, Inc.”. The plaintiff was requested to execute a proxy, designating some person to vote in his behalf at a meeting of stockholders and directors. Following the receipt of that letter the plaintiff wrote two letters, one to Mrs. Will and the other to Ward. In the letter to Mrs. Will he stated that he “ was mildly surprised because I believe you previously said you would try to retain all interest in the business until the war ended and until such time as I could return and make arrangements with Charlie to carry on the work ”, that he would be “ interested to know what value has been placed on the stock which Charlie is acquiring, in order that, if possible, I might make some attempt to protect the investment of money and time that I expended during my active period with the corp.”, that he thought there was a “ bylaw or separate agreement which states that no stockholder will sell or dispose of any stock without the agreement of the other stockholders,” that he would write to Ward, in whom he had “ every confidence ”, mention the agreement, and ask Ward’s plans for the future, that “ I’m not writing this with any idea of criticizing but only to let you know I’m still very much interested in the affairs of the M.C.E. Charlie can probably straighten me out on the whole affair, so, although I would be pleased to hear from you, I won’t expect an answer.” To Ward. *688 the plaintiff wrote the name of the person to vote for him, that he thought Ward made a “ fine deal ” which “ should * * * clear the air of the friction which apparently has existed for some time”, that he would like to know Ward’s “ present and future plans ” for the business as he was still interested, that he had written to Mrs. Will mentioning the stock agreement, but that his ‘ ‘ main reason for writing her is to let her know that I’m still very anxious to return to Great Neck after the war and to continue in the surveying business ’ ’, that although ‘ ‘ I have no desire to complicate your transaction with her, * * * I feel that I should hold the proxy until I hear from you ”, that he would like to hear from Ward soon, “ as I’m sure we can get together on arrangements of some kind to our mutual satisfaction and benefit.” Nothing further was done by the plaintiff with regard to the sale of stock until this action started in July, 1946, three months after the plaintiff’s discharge from the Navy and his return to work with Ward.
The status of the plaintiff Peets and the defendant Ward as stockholders was questioned upon the trial. I find that they were both owners of common stock at the time of the transfer from Mrs. Will to Ward of her deceased husband’s stock. Peets was referred to as a stockholder in the minutes of the corporation, and paid for his stock. “ The certificate of the corporation for the shares, or the stock certificate, is not necessary to the existence of the shares or their ownership. It is merely the written evidence of those facts. It expresses the contract between the shareholder and the corporation and his co-shareholders. But it is the payment, or the obligation to pay for shares of stock, accepted by the corporation, that creates both the shares and their ownership.” (United States Radiator Co. v. State of New York, 208 N. Y. 144, 149-150.) Ward was a stockholder, for not only are there many references to that fact in the minutes but the stock certificate was issued in his name; and in the absence of an indorsement, he is deemed to be the owner. (Personal Property Law, §§ 164, 182.) The fact that the certificate was found in Mr. Will’s safe is not proof to the contrary. The testimony of Ward, that his uncle D. 0. Will delivered the certificate to him and he (Ward) in turn requested Will to keep the same for him (Ward) in his (Will’s) safe is perfectly credible in view of the friendly and blood relationship between them. However, even if Will had not delivered the certificate, and Ward had no knowledge of its existence, Ward should still be regarded as the owner as to everyone excepting possibly Will himself. The transfer of the shares upon the books of the *689 corporation clothed Ward with legal title. That act as stated in Matter of Babcock (85 Misc. 256, 266, affd. 169 App. Div. 903, affd. 216 N. Y. 717) “ stands in the place of a delivery. Such an act performs precisely the office which an actual delivery would perform if it were a chattel.” See, also, Francis v. New York & Brooklyn El. R. R. Co. (108 N. Y. 93), wherein it was written at page 97: ‘ ‘ The transfer on the books of the company, and the issue of the new certificates, was a continuing affirmation by the corporation of ownership of the stock by the infants named in the certificates ”. The plaintiff in that case had stock issued in the name of his children but neither delivered the certificates to them nor informed them of the issuance of the stock. Here, Will made a gift of 25 shares and the issuance by the corporation of a certificate in the name of Ward required no consideration from Ward, as Will provided the consideration by surrendering that number of shares to the corporation for transfer.
Three questions arise with respect to the agreement for the sale of stock. (1) Was the agreement binding upon the parties to this action? (2) Was the agreement violated by the defendants, Will and Ward? (3) Should the plaintiff be granted specific performance if the answers to the first two questions are in the affirmative?
With respect to question number (1), I do not believe that the agreement was binding. The agreement was signed by D. C. Will, Clarence Monroe and John J. Eairden, as individuals. The certificate of incorporation, the by-laws as adopted at the first meeting, and the certificates of stock contain no reference to the agreement nor any restriction upon the transfer of stock, and therefore the corporation was not bound. (Matter of Argus Co., 138 N. Y. 557; Matter of Haecker, 212 App. Div. 167.) The plaintiff, Peets, was not a party to the agreement and the stock which he paid for was treasury or corporation-owned • stock. Ward’s stock certificate was issued to him by the corporation. As the corporation was not bound by the agreement, I do not believe that Peets or Ward were bound, regardless of their knowledge of the existence of the agreement. If it be assumed that the minutes of the stockholders’ meeting for March 30,1939, the directors’ meeting for September 5, 1940, and the directors’ meeting for January 8, 1942, reveal an amendment to the bylaws to make all subsequent transfers of stock subject to the conditions stated in the agreement, I hold that such amendment had no force or effect, for to be effective it was necessary to replace the outstanding certificates with new certificates stating *690 on the face thereof the restrictions of the agreement. (Hassel v. Pohle, 214 App. Div. 654; Cowles v. Cowles Realty Co., 201 App. Div. 460.) By statute, stock corporations are directed to reveal in the certificate of incorporation (Stock Corporation Law, § 5, subd. 4), and in the stock certificate (Stock Corporation Law, § 65), the restrictions upon the transfer of stock. Section 176 of the Personal Property Law provides in part “ there shall be no restriction upon the transfer of shares * * * by virtue of any by-law * * * unless * * * the restriction is stated upon the certificate.” Failure to comply with those statutory requirements in my opinion renders ineffectual the amendment to the by-laws. As the agreement was not binding upon either Peets or Ward, the sole remaining stockholder was not bound.
Question 2, whether the agreement was violated by Mrs. Will and Ward, is answered in the negative. Assuming the agreement was binding upon the parties, I do not believe that the transfer from Mrs. Will to Ward of either the 27 shares in the name of D. C. Will or of the 52 shares (assuming no gift of the 25 shares) constituted a breach of the agreement. The business of the corporation involved the personal services of the individuals who signed the agreement. The provision of that document that if any party wished to “ withdraw from the corporation that the remaining two members shall and hereby are given option to buy the stock * * * said options to run for ninety (90) days after person desiring to withdraw has announced his intention of severing connections with the corporation ” was not breached. Clearly it was the intention of the parties that only active participants in the business of the corporation were to hold stock. No more definite announcement could be given of the withdrawal of D. C. Will than the event of his death. From that date, the remaining stockholders had an option for 90 days to purchase the Will common stock and one year to purchase the preferred stock. Here, the sale was made some 14 months after Will’s death, and, prior to the sale, the plaintiff had not exercised his option by submitting an offer to purchase any of the stock. The plaintiff tacitly admits that the court’s interpretation of the quoted clause is correct by contending that he submitted no offer during the 90 days because Mrs. Will had deceived him by expressing an intention to retain the stock — meaning that in the absence of such statement by Mrs. Will he would have had to make his offer within 90 days of Will’s death. The evidence satisfies me that Mrs. Will was guilty of no such act of deceit. If she had so expressed herself, *691 the plaintiff could still have compelled a sale of the stock, for as stated previously, it was never the intention of the parties to have silent or inactive stockholders.
Question (3), should the plaintiff have specific performance? Assuming that the answers of the two prior questions were in the affirmative, I believe and hold that the plaintiff is not entitled to rescind the sale of stock or to enforce the agreement. "When the plaintiff was notified of the sale in May, 1945, he made no emphatic protest. He was merely ‘ ‘ mildly surprised. ’ ’ He congratulated Ward on his obtaining the stock and informed Ward that he had “ no desire to complicate your transaction.” To reclaim a certificate or rescind a transfer made after the owner’s death, it must be shown that the injured person has not waived the injury, or has not been guilty of laches in endeavoring to enforce his rights (Personal Property Law, § 168, subd. [d], par. 2). To acquiesce as the plaintiff did for more than a year after he was informed of the sale certainly indicates laches on his part. Moreover, the plaintiff has not at any time made an offer to purchase the stock in dispute. It has been held that in the absence of mutuality of obligation, specific performance will be denied (Levin v. Dietz, 194 N. Y. 376), and such relief will not be granted where an option has not been accepted (Pomeroy v. Newell, 117 App. Div. 800) as in this case.
As to the second cause of action, the plaintiff, as a director, has the right to bring such action but there must be proof to warrant judgment for the relief sought. There is no proof of conversion or waste of corporate assets. Informality may have been the custom rather than the exception in the operation of this business but in the absence of proof showing that Ward either benefited personally or was negligent in the handling of corporate affairs there is no basis for the findings requested. As the sole active member of the corporation after March, 1944 and prior to April, 1946, it was impossible for Ward to comply with all of the formal requirements but there is no showing of any injury to the corporation. In fact had Ward done nothing to keép the corporation in existence, had he let it die a natural death after March 30, 1944, the plaintiff would have had no ground for criticism. Instead he strove to keep the business going, for which he received not thanks but a lawsuit.
The plaintiff’s motion for judgment is denied, and the defendants’ motions for judgment dismissing the complaint are granted, with costs. Cross complaint of the defendant Ward dismissed, without costs.
Submit judgment on notice.