Edmee MATHEWS and Ernest L. Mathews, Jr., Executors under the Last Will and Testament of Ernest L. Mathews, deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 63 C 205.

United States District Court
E. D. New York.

Feb. 26, 1964.

Thomas L. Zimmerman, New York City, for plaintiff.

Vincent T. McCarthy, Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty., of counsel), for defendant.

DOOLING, District Judge.

By cross-motions for summary judgment in an estate tax case the parties seek to determine whether one hundred fifty shares of stock that decedent owned in G. X. Mathews Co. should be valued (a) at book value on June 30, 1958, that being the value at which, under an agreement among stockholders, the remaining stockholders had a right of first refusal of decedent's stock if he sought to transfer it outside the Mathews blood; or (b) at a value determined under 26 U.S. C.A. § 2031(b) without regard either (i) to the existence of the agreement granting the other stockholders a first refusal, or (ii) to the fact that the stock represented only 15% of the total outstanding stock of G. X. Mathews Co. The value used by the Government in collecting the tax was $315,000; the book value of the stock was $57,700.50. It is concluded that the value of the stock for estate tax purposes is not determined at book value by the stockholders' agreement but that the agreement is a factor affecting the value of the stock and that the stock is not to be valued as if control of the corporation's management inhered in decedent's ownership of 15% of the total corporate stock outstanding.

The Agreement among Stockholders in effect when decedent died on October 27, 1958, had been made on February 4, 1946, in modification and amendment of a similar agreement among stockholders made May 25, 1925. The Agreements recited the number of shares of G. X. Mathews Co. stock owned by each stockholder party and then the 1925 Agreement recited—

"WHEREAS it is the desire of all the parties hereto that said shares of capital stock shall not be transferred or sold by any of the parties hereto, without giving the other parties the opportunity to purchase the same."

The 1946 Agreement contained the same recital followed by a clause reciting the making of the 1925 Agreement and stating that the 1925 Agreement was "intended to remain in full force and effect except as modified and amended as hereinafter set forth."

The 1925 Agreement provided that—

" * * * none of the parties hereto shall sell, transfer or assign the shares of capital stock of THE G. X. MATHEWS CO. held by him to anyone, without first giving ninety (90) days notice in writing to each of the other parties hereto * * * giving each of the other parties hereto the right to purchase said shares of capital stock at its book value * * *."

The 1946 Agreement made two major changes. First, it prohibited only dis-

positions to those outside the Mathews' blood; it used this language—

"* * * none of the parties hereto shall sell, transfer or assign, excepting to lineal descendants, etc. * * *"

The right to purchase granted to the other stockholders in both Agreements is a right to purchase either in proportion to existing shareholdings (1946), or "in equal proportions" (1925); however the lineal descendants are granted the right in the 1946 Agreement to acquire the whole of their ancestor's shares if those shares are offered to the other shareholders rather than transferred directly to the lineal descendants of the stockholder. Thus the 1946 Agreement made lineal descendants permissible transferees and, where the ancestor, planning a sale, was required to offer his shares to the other shareholders, his own lineal descendants could, to the exclusion of the other shareholders, claim all the shares at book value. The second major change introduced in 1946 was to give the G. X. Mathews Co. the right to buy any of the shares that the offeree shareholders failed to buy.

Both Agreements forbade the Company to transfer any shares until satisfied by affidavit that the provisions of the Agreement had been complied with; both Agreements required that all stock certificates issued by the Company have imprinted on them a statement that the transfer of the shares of stock was subject to the Agreement; both Agreements required all the signing stockholders to consent to dissolution of the Company if the holders of 50% of the stock desired to dissolve the Company; and both Agreements contemplated that the Agreement would be filed with the Company. Cf. Personal Property Law, § 176. The 1946 Agreement, additionally, provided that the Company should make a one year loan to any offeree stockholder who wanted to buy offered shares but was "presently unable to purchase", the loan to be secured by the purchased stock.

The 1925 Agreement embraced all 1,000 shares of stock of G. X. Mathews Co. and was signed by seven stockholders. The parties to the 1946 Agreement held 995 of the 1,000 shares of G. X. Mathews Co. stock; there were, again, seven stockholders; five are persons who were signatories of the 1925 Agreement; two were not, but are evidently members of the Mathews family. Every one of the five persons signatory to both Agreements had changed his stockholdings, two decreasing, and three increasing, their holdings. There is no evidence to explain the 5 missing shares, or the occasions and mechanics of the transfers of shares that occurred between 1925 and 1946.

Decedent's will, made in 1954, bequeathed all his property in equal shares to his widow and son and he made them his executors. The will authorized the executors to retain and distribute in specie any property the decedent owned at death and empowered them to deliver the estate property "in kind and species" in making distribution and indicated that decedent's "investments shall be equally allocated in kind between" his widow and son. The Mathews stock evidently accounts for a good deal more than half the value of decedent's estate if treated as worth its full value rather than its book value.

The Government contends that the Agreements did not apply to the stock of decedent after his death; that the Agreements dealt only with decedent's sales of stock during his own life time and did not have application either to sales by the executors or to their distributions of stock under the will or to the legatees' sales of bequeathed stock. The executors contend that the stock is bound by the Agreements after as before the decedent died and cannot be transferred by the executors or the legatees except on the terms of the Agreements.

The first question then is what the Agreements mean. The question, it would seem, is not whether the contract "binds" the decedent's executors or estate for, by the very definition of contract, it does; the problem is, rather to determine by interpretation the nature,

application and duration of the rights and duties created by the Agreements; whatever they are, they benefit and obligate the decedent, his executors and his estate simply because they are contractual (and not delictual), although, as interpreted, they may chance not to confer any right or impose any duty that by its nature is capable of enjoyment or performance after the decedent's death. Cf. Chamberlain v. Dunlop, 1891, 126 N.Y. 45, 52, 26 N.E. 966; Gura v. Herman, 2d Dept. 1929, 227 App.Div. 452, 454, 238 N.Y.S. 230; Matter of Witkind, Surr.Ct.N.Y.Co.1938, 167 Misc. 885, 904, 4 N.Y.S.2d 933. So, the presence or absence in a contract of words like "executors and assigns," or of expressions to the effect that the contract is to bind the executors and estate of each party, do not operate, *ex proprio vigore*, to make the contract "binding" on the executors after the contracting party's death (for it binds them without those words) but such words help in interpretation by indicating whether the parties intended contractual performances to continue beyond death even though, in some degree, they involved personal qualities or other (e. g., credit) elements that would otherwise have suggested an implicit limitation of performance to the life of the contractor. Cf. American Chain & Cable Co. v. Arrow Grip Mfg. Co., Inc., Warren Co. 1929, 134 Misc. 321, 324, 235 N.Y.S. 228; Baldwin & Co., Inc. v. Kohler, App.Term, 1st Dept. 1916, 94 Misc. 142, 144, 158 N.Y.S. 278; New York General Construction Law, § 39; 4 Corbin, Contracts (1951) 434 et seq. §§ 865–868, 6 id. 355, 374, §§ 1331, 1334–1335; Restatement, Contracts (1932) § 459.

■ Do the Agreements, here, mean that "transfer" by will gives the other stockholders the right to call for the stock at book value? And, if not, what, if any, effect have the Agreements on the stock bequeathed by decedent? Storer v. Ripley, N.Y.Co.1958, 12 Misc.2d 662, 178 N.Y.S.2d 7 and Lane v. Albertson, 2d Dept. 1903, 78 App.Div. 607, 79 N.Y. S. 947 emphasize that, in the absence of an explicit provision giving the other stockholders a right to call for the stock of a decedent upon and by reason of his death (See Scruggs v. Cotterill, 1st Dept. 1902, 67 App.Div. 583, 73 N.Y.S. 882), the courts of New York are slow to read the word "transfer" broadly in a first refusal agreement and are slow to treat transmission by will as requiring a sale to the other stockholders. Neither case states that the stock in the hands of the legatee, is discharged of the restriction in the event the legatee seeks to make a sale. Plainly, in Lane v. Albertson the stock would continue subject to the by-law. Cf. Estate Funds, Inc. v. Burton-Fifth Avenue Corp., Sup.N.Y.Co.1952, 111 N.Y.S.2d 596, 598. The Storer case implies a view that the restriction was to last only during Ripley's life because the arrangement contemplated, in addition to the cross-options, that Ripley would be a director, employee and indispensable to a quorum of directors. While the factors mentioned would appear to induce the conclusion that, since the relation was so intimate, death would be a proper occasion for the survivor to claim the stock and choose a new partner with whom so intimate a relation could be tolerable (Cf. Holmes, C. J., in Barrett v. King, 1902, 181 Mass. 476, 479, 63 N.E. 934, 935), the Court was impressed that the decedent would not have meant to provide for the ouster of his own widow and sons from his own corporation and intimated, gratuitously, that they also took free of the first refusal. Cf. Stern v. Stern, 1945, 79 U.S.App.D.C. 340, 146 F.2d 870 (no indication stock "free" in hands of legatee); In the Matter of Trilling & Montague, Inc., E.D.Pa. 1956, 140 F.Supp. 260 (transfer by bankrupt's trustee not within stockholder agreement where the Stockholders could bid at trustee's sale). Contrast Boston Safe Deposit & Trust Co. v. North Attleborough Chapter, 1953, 330 Mass. 114, 111 N.E.2d 447.

The question is one of interpretation and not of the existence of a rule of law that requires a conclusion that if the words "executors and assigns," or equal,

are not used, the contract rights and duties do not survive any party's death. In the present case the Agreements say nothing about personal representatives or distributees or assignees of stock. If narrowly read, the Agreements would literally forbid only the parties themselves from making transfers outside the family circle and would not forbid a transfer by a lineal descendant to whom a party permissibly transferred stock or by any other permitted transferee. Cf. Peets v. Manhasset Civil Engineers, Inc., Nassau Co. 1946, 4 Misc.2d 683, 689, 68 N.Y.S.2d 338, 345. Specifically, the bequest to the widow and son in the present case, if considered a permitted transmission, would take the stock quite outside the Agreements.

So literal a reading does not express the manifest sense and purpose of the Agreements. The purpose is to keep family ownership intact. Cf. Serota v. Serota, Queens Co. 1938, 168 Misc. 27, 29, 5 N.Y.S.2d 68. The Agreements may be imperfectly drafted to achieve that objective by inescapably compelling language (Cf. Krieger v. Mazlish, Sup. Nassau Co. 1955, 145 N.Y.S.2d 815), but they do make plain their breadth and simplicity of purpose in the recital quoted above, the lineal descendant exemption, the legend on the stock certificates, the provision for offering the stock to the Company if the other stockholders do not take it up, in the provision for having the Company finance purchases if need be, and in the provision that enables lineal descendants to take their ancestor's stock in preference to other stockholders and the Company. The contract relates to stock, not to employment, or to office. It is directed to creating in each stockholder's stock an equity in favor of the other stockholders, to creating, that is, as an incident of each stockholder's stock ownership a veritable property interest in the stock of every other stockholder. Cf. Matter of Fieux, 1925, 241 N.Y. 277, 280, 282–283, 149 N.E. 857; Matter of Petition of Argus Co., 1893, 138 N.Y. 557–574, 34 N.E. 388; Oppenheim, Collins & Co. v. Beir, N.Y.

Co., 1946, 187 Misc. 428, 64 N.Y.S.2d 19; Matter of Sherman, Surr.Ct.N.Y.Co. 1951, 9 Misc.2d 731, 104 N.Y.S.2d 988; Ames, Lectures on Legal History (1913) 388, 390 et seq. The interest sought to be protected, intact family ownership, was not an interest the need to protect which terminated with the death of a party; on the contrary, as the lineal descendants' exemption and preference emphasize, a death in the family was an occasion on which the interest in preserving intact family ownership required in some form the protection of the Agreements. The sole function of the Agreements is to protect the interest of each stockholder party in his own stock by assuring him—so long as he is himself a stockholder—a qualified power over the alienation of the stock of any other stockholder to persons outside the Mathews family, a qualified power to acquire stock sought to be transferred out of the family or to join in requiring the Company to do so.

The plain objectives of the Agreements require their interpretation as imposing the restrictions on the stock involved in the hands of legatees and of descendants notwithstanding the failure of the Agreements to use expressions literally naming permitted transferees, including descendants, as parties whose stock is bound by the Agreements—save as may formally follow from their receiving stock certificates imprinted with the legend referring to the Agreements. Taking the Storer and Lane cases as illustrating a canon of interpretation that requires expansive clarity of expression to disclose an intention to oust the natural objects of a stockholder's testamentary bounty in favor of co-stockholders, a canon that considers the word "transfer" ordinarily too general to make a testamentary transmission to a natural object of the testator's bounty either a "sale, assignment, transfer or hypothecation," or a "sale or transfer"— since such testamentary transmission is not usually inimical to the association— preserving objective of such "lock-in" agreements—it is nonetheless necessary

to control the operation of the canon of interpretation within the objectives of the instrument, to avoid having "interpretation" subvert the manifest objectives of the instruments, in consequence of adopting a narrowed interpretation of "transfer" in the professed interest of attaining the instruments' objectives. If here, testamentary transmission to the natural objects of the stockholders' bounty were treated as not a "transfer" and is treated as also freeing the transmitted stock of all the strictures of the Agreements in the hands of the executors and legatees (and the case is the same for *inter vivos* transfers to lineal descendants or to other familial transferees), the Agreements would be frustrated, they could not fulfill their critical function. The long term continuance of that function is evident in the fact of executing the 1946 Agreement after twenty-one years under the 1925 Agreement and is more evident in the nature of the 1946 changes which orient the Agreement toward the future by dealing with the problem of transfers to lineal descendants.

The Agreements must be read as applying to stock in the hands of permitted transferees who have notice of the Agreements or who are volunteers. Cf. Tomoser v. Kamphausen, 1954, 307 N.Y. 797, 121 N.E.2d 622; Hassel v. Pohle, 2d Dept. 1925, 214 App.Div. 654, 212 N.Y.S. 561; Estate Funds, Inc. v. Burton-Fifth Avenue Corp., N.Y.Co. 1952, 111 N.Y.S.2d 596, 598; Krieger v. Mazlish, Sup. Nassau Co. 1955, 145 N.Y.S.2d 815, 818. Compare Rosenberg v. Lincoln Rochester Trust Co., Sup. Monroe Co. 1947, 72 N.Y.S.2d 130, 139–140. Contrast Peets v. Manhasset Civil Engineers, Inc., Nassau Co. 1946, 4 Misc. 2d 683, 689, 68 N.Y.S.2d 338, 345 (notice irrelevant where restriction considered in terms inapplicable); Robertson v. Nicholes Co., Inc., Mun.Ct.1941, 141 Misc. 660, 253 N.Y.S. 76 (possibly suggesting that a transferee with notice cannot obtain transfer of stock but can sue for damages in some circumstances).

■ It results that because the Agreements did not require the estate to make an offering of the stock at book value (or any other fixed price) to the surviving stockholders or the Company when the decedent died, the value of the stock is not, for estate tax purposes, the book value of the stock. James v. Commissioner, 2d Cir. 1945, 148 F.2d 236; Commissioner v. McCann, 2d Cir. 1944, 146 F.2d 385; Krauss v. United States, 5th Cir. 1944, 140 F.2d 510; Worcester County Trust Co. v. Commissioner, 1 Cir. 1943, 134 F.2d 578. See United States v. Land, 5th Cir. 1962, 303 F.2d 170, 174; Estate of Ambrose Fry, 1947, 9 T.C. 503, 508–509; Frederick A. Koch, Jr., 1933, 28 B.T.A. 363, 365; Michigan Trust Co., 1933, 27 B.T.A. 556, 560–562; Cf. City Bank Farmers Trust Co. 1931, 23 B.T.A. 663, 669. The instances in which a contract price is held to fix the value of stock for estate tax purposes are, naturally, only those instances in which the contract price represents all the value the estate can get from the stock if all parties involved act as their manifest interest dictates. Wilson v. Bowers, 2d Cir. 1932, 57 F.2d 682 (at testator's death others had right to buy testator's stock at $6⅔ a share; it was "worth" $23.55 a share); Lomb v. Sugden, 2d Cir. 1936, 82 F.2d 166 (at testatrix's death other stockholders had option on 90% of her shares at $69.45 a share, when it was "worth" $370.46 a share); Commissioner v. Bensel, 3rd Cir. 1938, 100 F.2d 639 (decedent gave "hostile" son option to buy decedent's stock at a fixed price); May v. McGowan, 2d Cir. 1952, 194 F.2d 396 (son had unrestricted option to acquire decedent's stock at zero).

■ The Agreements have been interpreted as obligating the executors and legatees to offer the stock to the other stockholders and to the Company at book value at the time of the offer before attempting to transfer it to anyone other than lineal descendants of the original stockholder. So long as book value is materially less than the intrinsic value of the

stock, the Agreements are necessarily a factor affecting the value of the stock. They affect the value by creating a substantial probability that the stockholders, although free to own the stock and bequeath it to their families, will not be able to realize a full and fair value for the stock upon an open market sale. In valuing the stock for estate tax purposes the effect of the Agreements must, therefore, be taken into account. Worcester County Trust Company v. Commissioner, supra, 134 F.2d at page 582; Krauss v. United States, supra, 140 F.2d at page 511; Commissioner v. McCann, supra, 146 F.2d at page 386; James v. Commissioner, supra, 148 F.2d at page 236.

█ The valuation procedure should not treat the decedent's interest as if control inhered in it. While there is no evidence that the Commissioner has done so, and it does not much matter whether, for present purposes, stock is thought of as worth less because control does not inhere in it or more because (and where) control does inhere it, the point is that, in the revaluation that must ensue in this case, the process must take account of the fact that the stock in question is 15% of the stock of a closely held company. See Worthen v. United States, D.Mass.1961, 192 F.Supp. 727, 729, 730, 732; Estate of Irene de Guebriant, 1950, 14 T.C. 611, 619, rev'd other issues, Claflin v. Commissioner of Internal Revenue, 2d Cir. 1951, 186 F.2d 307.

It would be temerarious to suppose that counsel on one or the other side may not consider whether there is evidence that could properly induce a reconsideration of the interpretation placed on the Agreements. It is not intended to foreclose that. However, but for a reconsideration based on a proffer of evidence, it is considered that partial summary judgment is appropriate to the extent of determining that:

1. The Agreements do not create a right in the surviving stockholders, the Company, or Ernest L. Mathews, Jr., as lineal descendant of decedent to have the executors of decedent to have the executors of Ernest L. Mathews or his legatees offer the 150 shares of stock to them or any of them at book value at June 30, 1958.

2. The Agreements entitle plaintiffs as Executors to receive by testamentary transmission the 150 shares of stock and to distribute the said shares to themselves as legatees without there occurring (by such transmission or distribution or combination of transmission and distribution) "a sale, transfer or assignment" of the 150 shares of stock within the meaning of the Agreements.

3. The plaintiffs as executors and also as legatees held and will hold the 150 shares of stock subject to the terms of the Agreements with the same effect as if they were signatories of the Agreements recited as owners and holders of the 150 shares except that, so far as concerns Edmee Mathews, "lineal descendants" would include only lineal descendants of decedent and Edmee Mathews, her holding being in right of his ownership and holding and not of an independent owning and holding.

4. Valuation of the stock requires taking into account

(i) The Agreements, interpreted as set forth in paragraphs 1, 2 and 3 above; and

(ii) The size of the decedent's stockholding in relation to the total stock outstanding,

among all other appropriate valuation factors.

Accordingly, on plaintiffs' motion for summary judgment and defendant's motion for partial summary judgment, it is

Ordered that the motions are granted to the extent only hereinabove set forth and to the extent of limiting the trial to the issue of value determined on the basis of taking into account the factors hereinabove set forth and the motions are otherwise denied.