Joseph W. WORTHEN and Boston Safe Deposit and Trust Company, Executors of the Will of Robert M. Stone, Deceased

v.

UNITED STATES of America.

Civ. A. No. 58-1113-F.

United States District Court
D. Massachusetts.

April 3, 1961.

2. Memorandum order, dated September 24, 1954.

728

Joseph W. Worthen, Palmer B. Worthen, Roger B. Coulter, Parker, Coulter, Daley & White, Boston, Mass., for plaintiff.

Elliot L. Richardson, U. S. Atty., James C. Heigham, Asst. U. S. Atty., Boston, Mass., L. Lee Philips, Dept. of Justice, Washington, D. C., for defendant.

FRANCIS J. W. FORD, District Judge.

This is an action to recover an alleged overpayment of estate taxes made by plaintiffs as executors under the last will of Robert M. Stone. Two issues are involved: (1) the valuation of certain shares of stock owned by decedent and included in his estate, and (2) the question of whether certain payments amounting to $30,000 made to Stone's widow were properly included in Stone's estate.

Valuation of Stone and Forsyth Stock

Stone and Forsyth Company is a Massachusetts corporation, incorporated in 1914, as successor to a partnership which had carried on the same business for many years before that date. It is engaged in business chiefly as a wholesaler of coarse paper products. In the five years preceding Stone's death 75 per cent of its sales and 60 per cent of its profits were derived from this branch of its business. It also owns and operates a factory in which it manufactures folding paper boxes for sale at wholesale. Since 1950 it has had a wholly owned subsidiary, Symonds Paper Company, which is engaged in a similar wholesale paper business.

Robert M. Stone at the time of his death on November 30, 1953, was treasurer and one of the seven directors of Stone and Forsyth Company. He owned 840 out of the 4,528 shares of its common stock then issued and outstanding. It is the fair market value of those shares as of that date which is at issue here. The executors included these shares in the assets of the estate at a valuation of $100 per share. The Commissioner of Internal Revenue made a deficiency assessment based on his determination that the fair market value was $175 per share.

The stock of the corporation has not been listed on any exchange nor has it been transferred in over the counter transactions. It is owned chiefly by officers and employees. The only transfers in recent years have been between the corporation and its employees or their families at a fixed price which has no significance as to the real market value of the stock.

Where there are no actual sales or bona fide bid and asked prices available from which the value of shares of stock can be determined, the fair market value must be arrived at by a consideration of all the factors which would be taken into account by an informed purchaser and seller. Among such factors are the soundness of the corporation, its business prospects and the economic outlook generally and in the specific industry involved, the net worth of the corporation, the book value of its stock, the earning power of the corporation, its dividend paying capacity, and the value of stocks of corporations engaged in the same or a similar line of business which are listed on an exchange. Internal Revenue Code of 1939, § 811(k), 26 U.S.C. § 811(k); Treasury Regulations 105, § 81.10(a) and (c); Rev.Rul. 59.60, 1959–1 Cum. Bull. 237.

The testimony of each of the parties on this issue consisted chiefly of the testimony of an expert witness who analyzed the various factors to be considered, and on the basis of this analysis arrived at an opinion of the fair value of the stock of the corporation. The differences be-

tween the two approaches of these experts can best be understood by briefly outlining the analysis made by each one.

Plaintiffs' expert found that the corporation stock had a book value of $295 per share and a net working capital of $158. In view of the fact that no liquidation or merger was likely and that the corporation did not use its assets as effectively as some comparable companies which had a higher percentage return on invested capital, he concluded that, based on asset value alone, a fair valuation for the stock would be $170 per share.

The earning power of the corporation was next considered. Since the two years immediately preceding Stone's death were years when the corporation's earnings were unusually low, the average over the preceding ten-year period, including these low years and the unusually high years of the Korean war period, was given particular weight as being a more accurate reflection of the prospective earning power of the corporation. On this point in particular the expert relied on the earnings figures of three companies he selected as being fairly comparable to Stone and Forsyth Company, for the purpose of arriving at a value per share of stock which would give a price earnings ratio similar to the price earnings ratio of the companies chosen for comparison. On this basis the expert's valuation of the stock was $125 per share.

In considering his third important factor, yield, plaintiffs' expert gave considerable weight to the fact that although earnings of the company had varied substantially from year to year, the corporation has consistently paid an annual dividend of $7 per share. Concluding from this that the corporation had a fixed policy of paying such a dividend and taking into account the ratio between the price of the stocks of the companies selected for comparison and the dividends paid by them, he fixed the value of the Stone and Forsyth stock on the basis of yield considered alone at $85 per share.

In arriving at a final valuation the expert gave by far the greatest weight to the factor of earnings, while giving what he called moderate weight to the figures derived from net worth and yield, and reached a figure of $123 per share as the intrinsic worth of the stock. In the light of the difficulties which would be encountered in actually selling a minority holding of shares not listed on any exchange or publicly traded, he felt that this intrinsic value should be discounted by about 15 per cent to give a figure of $104 as the fair market value of the stock.

The expert for the government also took into consideration statistics of ten companies which he considered comparable. His list included none of the companies used by plaintiffs' expert. One highly important difference in the procedure of the two experts arises from the fact that government's expert considered that the corporation had an excess investment in United States government securities. On the basis of the holdings of such securities by the companies he used for comparison he concluded that 7 per cent of total tangible assets would be an adequate and normal investment. Holdings beyond this amount he considered excessive, to be treated as a separate element in the valuation of the stock. These government security holdings he computed to be about $60 per share.

The income of the corporation was considered, excluding the income from United States government securities valued separately and also income from the subsidiary. On the basis of the price earnings ratio of the ten companies chosen for comparison, a value for the stock based on earning power was found to be approximately $75 per share. The value of the stock of the subsidiary Symonds Paper Company, Inc. owned by Stone and Forsyth Company was considered separately, being valued in the same way by applying to its income the price earnings ratio of the companies chosen for comparison and valuing separately the holdings of United States government securities considered to be excessive. The result was a valuation for the investment

in Symonds of $38.65 per share of Stone and Forsyth stock.

The combination of these three factors produced a total value of $173.65. The expert believed that this should be increased because of the high book value of the stock. By applying the ratio of price to book value of the stocks of the companies selected for comparison to the book value of the Stone and Forsyth stock, he reached a value for the stock on that basis alone of $245 to $248 per share. A similar comparison ratio of the prices of these stocks to dividends paid gave a valuation for the Stone and Forsyth stock of about $107 per share. This figure he considered too low because the earnings record showed a capacity to pay dividends in excess of the $7 dividend which it appears it was the policy of the company to pay. On the basis of all these factors the expert reached a value of $180 per share. This he believed should be discounted at least 10 per cent because of unfavorable factors, chief of which was the lack of marketability. Hence he arrived at a final value for the stock of $163 per share.

The principal differences between the two experts lie in their choice of companies to be used for purposes of comparison and in their handling of the corporation's holdings of government securities.

Clearly no company was found by either side which was perfectly comparable in all respects to Stone and Forsyth. However, the companies used by plaintiff seem to be more closely comparable than those used by the government. Not one of these companies was a wholesaler and only one was a non-integrated converter. Stone and Forsyth was, of course, primarily a wholesaler with a substantial business as a non-integrated converter. None were closely comparable in size. Stone and Forsyth sales, including its subsidiary, were less than $4,000,000 annually while only one of those companies had annual sales less than $13,000,000. The three companies used by plaintiffs' expert, while larger than Stone and Forsyth, were much closer in size than defendant's companies, two of them were engaged in wholesale distribution of paper products and one was an integrated converter of paperboard.

The more important difference, however, lies in the treatment of Stone and Forsyth's holdings of government securities. It is the contention of government that since the corporation had about 25 per cent of its total tangible assets invested in government securities, while the average investment in such securities by the companies chosen by the government as comparable was only 7 per cent, this allegedly excess investment should be valued separately. There are cases in which such a procedure is justified. Where a corporation holds a large portion of its assets, not needed or used in its business operations, in the form of an investment in securities, it can readily be seen that a stockholder in control of the corporation can at any time without affecting the business operations of the corporation cause this investment to be liquidated and the proceeds distributed to stockholders either as a dividend or by way of partial liquidation, or else cause the securities themselves to be distributed in kind. Thus the value of a share of stock is really composed of two elements, a share in the value of the company as an operating business, and a share in the value of the investment in securities. Hence it is proper to find that the value of a share is the total of these two values separately determined. Schlegel v. United States, D.C., 71 F. Supp. 495.

Such a situation is not found in the present case. Here we have a minority stock interest, 840 shares out of 4,528 outstanding. Assuming that there is here an investment fund available for distribution, the purchaser of such a minority interest would have so little prospect of causing it to be distributed that he would certainly not be willing to pay the full theoretical value which government's expert would give it.

More important, it cannot be found that the corporation did have an investment fund here in excess of its operating

needs and separable from them. Government's expert assumed that because Stone and Forsyth had an investment in government securities much larger than that of the companies selected for comparison, that this represented funds not needed in the business and simply held as an investment. Such an assumption is unjustified on several counts.

In the first place, it involves a misinterpretation of the nature and purpose of the corporation's holdings of government securities. Government relies on the showing in the corporation's income tax returns that its holdings of such securities at the end of the fiscal year ending January 31, 1953, amounted to $398,369.-91, on January 1, 1954, to $375,219.12 and on January 31, 1955, to $376,260.47, to establish that the corporation had almost $400,000 permanently invested in such securities. However, the returns further show that this total was not permanently held. For instance the corporation bought $109,967.92 in treasury bills on January 29, 1953, which were sold on February 5, 1953, and not replaced. The cash on hand on January 31, 1953, amounted only to $49,239.18. At the end of the next year the corporation held treasury bills in the amount of $99,704.33 purchased on December 22, 1953, sold on February 18, 1954, and not replaced, and $199,986.67 in such bills purchased on January 28, 1954, sold on February 4, 1954. These latter were partially replaced but the holdings amounted to only $124,896.67 after February 4, 1954, and only $74,863.50 after May 27, 1954. The cash on hand on January 31, 1954, amounted to $35,349.79. What actually occurred was that the corporation temporarily converted as much of its cash as possible into government securities at the end of its fiscal year because this resulted in a state tax saving because such securities were tax exempt under the Massachusetts statute then in force, Mass.G.L. Ch. 63 § 30, subd. 3(b). Hence a large part of the corporation's holdings of government securities at the close of its fiscal year is clearly not a permanent investment of excess funds, but merely a temporary conversion of cash reasonably needed as working capital for the business. Since there is no evidence that the corporations used for comparison had any tax motive for converting cash into government securities, conclusions drawn from the relative size of such security holdings are unjustified.

In order to determine whether Stone and Forsyth did have assets not needed for its business operations which could properly be evaluated separately by the method used by the government's expert, a proper comparison would be between the relative amounts of working capital, that is, the excess of total current assets including cash and its equivalent in readily marketable securities over current liabilities. As shown by the calculations in plaintiffs' Exhibit 4, Stone and Forsyth's 1953 total working capital amounted to 19¢ per dollar of 1953 sales. The comparable figure for the companies used by government's expert was 21¢ per dollar of sales and for the companies used by plaintiffs' expert was 20¢ per dollar of sales. Certainly this does not indicate that Stone and Forsyth's total cash and holdings in government securities was excessive.

Moreover, government's expert seems to have worked solely from the figures shown in financial statements without making any inquiry as to particular factors which might affect the amount of working capital needed by the corporation. In fact, the corporation had been following the policy of setting aside earnings in excess of its usual dividend for the purpose of financing a program of expansion and rehabilitation. In 1948 it acquired a new building in Cambridge for its wholesale operations at a cost of $440,000. In 1950 it acquired its subsidiary Symonds Paper Company at a cost of $123,000. In 1953 it planned to lend $80,000 to its subsidiary for improvement of its facilities, and also planned extensive improvements to its manufacturing plant in Everett. These plans were in fact carried out, utilizing accumulated earnings. There clearly was no accumulation by the corporation of

assets in excess of business needs which would require separate evaluation.

The testimony of the government's expert must be considered in the light of this conclusion. In arriving at a valuation of the stock based on the business operations of the corporation, he finally arrived at a figure of 7.5 by which he multiplied the earnings per share to arrive at a valuation which he concluded fairly took into account all the relevant factors. Eliminating the segregation of government securities and applying this multiplier to the total earnings of the corporation and its subsidiary, including interest on the government securities, gives a value per share of $112.50. Reducing this by an 11 per cent discount for non-marketability gives a value of $100.-13. Thus when the improper segregation of government securities is eliminated, the two experts are found to be in remarkably close agreement as to the value of the stock.[1]

■ The conclusion must be that the conclusion of plaintiffs' expert represents a sound evaluation of the stock giving due weight to all of the factors involved. The court finds that the fair market value of the stock of Stone and Forsyth Company on November 30, 1953, was $104 per share.

### Payments to Dorothy Stone

On October 23, 1952, the corporation entered into a contract under seal with Robert M. Stone. Pertinent provisions of this contract were as follows:

"(1) After and by reason of the death of the employee while in the employ of said company, it will pay to his widow the amount of his basic annual salary as of the date of his decease.

"(2) If the employee leaves no widow, the payment shall be made to his children, if any; and if none, then to his brothers and sisters. Any amount so becoming payable to his children or to his brothers and sisters, shall be allocated among them in accordance with the latest directions signed by the employee and deposited with the treasurer of the company. If no such directions are so given, the allocation shall be made equally among the members of the group entitled to the payments.

"(3) If the employee shall not at his death be in the employ of the company, but shall have retired with its written consent and shall not have entered thereafter into the employ of a competing concern, said payments shall be due as if he had died while in the company's employ; and the amount shall be that of his annual basic salary at the date of his retirement."

At the time of Stone's death he was receiving a salary in the amount of $1,-500 per month, or $18,000 per year. The company also had customarily paid bonuses annually to officers and heads of departments. For at least ten years before his death Stone had received an annual bonus of $12,000 per year. At the time of Stone's death the company was the beneficiary of insurance policies on his life having a total face amount of $30,000.

Following Stone's death the directors voted to pay to his widow Dorothy Stone the amount of his basic salary of $1500 per month for eight successive months beginning with January, 1954. This was to be in addition to the $18,000 to be paid under the contract. Between December 11, 1953, and June 11, 1956, payments were made to Mrs. Stone by the corporation totalling $30,000. (An additional payment of $1,190.60 on September 17, 1954, is not involved in this action.) The corporation on its income tax return for its fiscal year ending January 31, 1954, claimed and was allowed a deduc-

1. Government expert's evaluation based on comparison of the ratio of prices to dividends gave a value of $107. His evaluation based on book value was $245 but admittedly this is not to be given great weight where no merger or liquidation is in prospect.

tion of $30,000 for compensation paid to Mrs. Stone.

Government contends that this $30,000 paid to Mrs. Stone should be included as an asset of Stone's estate under § 811 of the Internal Revenue Code of 1939, 26 U.S.C. 1952 ed., § 811. Relevant parts of that section read as follows:

"Sec. 811. Gross Estate

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

"(a) *Decedent's Interest.* To the extent of the interest therein of the decedent at the time of his death;

\*  \*  \*  \*  \*  \*

"(c) *Transfers in contemplation of, or taking effect at, death.*

\*  \*  \*  \*  \*  \*

"(3) Transfers taking effect at death—transfers after October 7, 1949. An interest in property transferred by the decedent after October 7, 1949, shall be included in his gross estate under paragraph (1) (C) of this subsection (whether or not the decedent retained any right or interest in the property transferred) if and only if—

"(A) possession or enjoyment of the property can, through ownership of such interest, be obtained only by surviving the decedent \* \* \*"

Government contends that the $18,000 paid to Mrs. Stone was an interest in property owned by decedent within the meaning of § 811(a). It argues that Stone had a valuable contract right, conceded by plaintiffs to be enforceable against the corporation, to have a year's basic salary paid to his widow, and that this was a right of the same type which was held to constitute property within the meaning of § 811(a) in Estate of Garber v. Commissioner of Internal Revenue, 3 Cir., 271 F.2d 97; Goodman v. Granger, 3 Cir., 243 F.2d 264; Beaver Trust Co. v. United States, D.C., 184 F.

Supp. 553, and Wolf's Estate v. Commissioner of Internal Revenue, 29 T.C. 441, reversed on other grounds, 3 Cir., 264 F. 2d 82. These cases hold that death benefits are includable in the gross estate when they are derived from funds which represent deferred compensation to the decedent, or granted under plans which explicitly gave the decedent direct contractual rights in the funds. These terms have not been more explicitly defined. In a sense any death benefit to an employee's survivors given in consideration of his services to the employer might be considered deferred compensation, but the deferred compensation referred to seems to be of the type found in Wolf where there was a trust fund to which the employer made annual contributions equal to 15 per cent of the compensation otherwise payable to participating employees. Similarly the type of direct interest in the fund involved in each of the cases cited seems to have been a right of the decedent himself to have received at least a part of the payments involved if he had been alive to receive them after the age of retirement. These elements are not found in the present case. There was no regular payment of any portion of what Stone would otherwise have earned into any fund. Stone had no direct right ever to receive any payment himself under the contract. It cannot be held that under the contract here Stone had any property right taxable under § 811(a).

Plaintiffs contend that the payments were not taxable under § 811(c) (3) since the only payment involved was from the corporation to Mrs. Stone, and that Stone actually transferred nothing to anybody. Government's position is that Stone furnished the consideration for the transfer and hence is the real transferor, Lehman v. Commissioner of Internal Revenue, 2 Cir., 109 F.2d 99, and that since Mrs. Stone could receive the payments only by surviving Stone, the contract clearly constitutes a transfer taxable under § 811(c) (3).

██ It is true that the contract does not expressly set forth any consideration given by Stone. Plaintiffs seem to

argue that since the contract was under seal, that this establishes that there was no consideration for the corporation's promise. It is true that the seal imports consideration so that it is not necessary to show any actual consideration to establish the validity of the contract. But this does not mean that actual consideration was not given. As plaintiffs point out, Stone made no promise of any benefit to the corporation, and references to his continued employment, retirement or employment by competitors are phrased in terms of conditions. Taxability, however, should be determined by the real substantial nature of the transaction and not by technicalities of phrasing. Realistically the corporation here was not motivated by any simple desire to make a gift to Mrs. Stone at some future date. Its purpose, as evidenced by the conditions inserted in the contract, was to secure for itself the continuance of Stone's services. That was the consideration for which it was bargaining and it made no promise to pay unless that consideration was received. Realistically Stone's future services were the consideration for which the promise of payment was made and his entering into the contract amounted in substance to a transfer to his wife or whoever might be the ultimate beneficiary of the payment which would become due upon his fulfillment of the conditions of the contract. The payments thus transferred were properly included in his estate under § 811(c) (3).

Government contends that the additional $12,000 paid to Mrs. Stone was really only the rest of Stone's yearly compensation and should be treated in the same way as the $18,000. There are significant differences between the two payments. Stone himself had no right to the $12,000 in the same sense in which he was entitled to his monthly payments of his basic salary. While in the light of the corporation's policy he might reasonably have expected to receive the bonus each year, he had no right to it unless and until the corporation voted to pay it. Moreover, the corporation in its contract with Stone agreed only to pay the amount of the basic salary. There was no evidence of anything in the policy or previous practice of the corporation on which he could have grounded any strong expectation that the corporation would pay his widow the amount of the bonus in addition to the amount of the basic salary. There is no basis for holding that as to the $12,000 paid to Mrs. Stone, Stone at the time of his death had any property right in it or had ever made any transfer of it.

As agreed by the parties in their stipulation the amount of the judgment to be entered is to be computed by the parties and submitted to the court.

Judgment will be entered for plaintiffs in accordance herewith.