Estate of Sidney L. Katz, Deceased, Eugene Katz, Executor v. Commissioner.
Estate of Katz v. Commissioner
Docket No. 571-66.
United States Tax Court
T.C. Memo 1968-171; 1968 Tax Ct. Memo LEXIS 130; 27 T.C.M. (CCH) 825; T.C.M. (RIA) 68171; August 5, 1968. Filed John M. Burns, III, Robert Scheff, for the petitioner. Julius M. Jacobs, Denis M. Neill, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $57,133.19. By amended answer, respondent alleged an increased deficiency of $40,842.76, or a total deficiency of $97,975.95. The sole issue presented for decision is the value of 978 shares of stock of The Katz Agency, Inc., held by decedent on the date of his death. Findings of Fact A. Preliminary Matters Eugene Katz is the surviving co-executor of the Estate of Sidney L. Katz, who died on August 25, 1961. The estate tax return for the estate was filed with the district director of internal revenue at Newark, New Jersey, on November 23, 1962. *131 Sidney L. Katz (hereinafter sometimes referred to as "decedent") owned 978 shares of $100 par value capital stock of The Katz Agency, Inc., on the date of his death. On Schedule B of decedent's estate tax return, petitioner valued the 978 shares at the date of decedent's death at $290 per share. In his notice of deficiency, respondent determined that the fair market value of the 978 shares was $600 per share; by amended answer, respondent alleged that the fair market value of the stock was $850 per share as of the date of decedent's death; at trial, respondent's expert witness valued the stock at $800 per share. The Katz Agency, Inc. (hereinafter referred to as "Katz Agency," "the Agency," or "the Corporation"), is a corporation organized under the laws of the State of New York in 1912 to take over and continue the business founded by Emanual Katz in 1888 of representing newspapers in the sale of advertising space. During the 1930's, the Corporation expanded its operations to include the representation of radio stations in the sale of non-network ("spot") commercial time. In the 1940's, the Corporation again expanded its operations to include the representation of television stations *132 in the sale of non-network ("spot") commercial time. Since then, the Corporation has been engaged continuously in the business of serving as advertising sales representative for newspapers, radio stations, and television stations. B. Stock Ownership The Corporation's stock was originally issued to the members of the Katz family. As the business of the Corporation increased, several non-family employees were placed in various key positions of management and became officers of the Corporation. To further stimulate their personal interest in the Corporation and as an incentive for them to increase its earnings and thereby increase their own compensation, the Corporation, from time to time, issued to these key employees its shares of stock under restrictive agreements described below. All of this was intended to be, and in fact was, a deferred compensation arrangement. To enable the Corporation to issue such stock, members of the Katz family released the requisite number of their shares of stock to the Corporation. On December 31, 1953, the Corporation had an authorized capitalization of $189,000, consisting of 1,890 shares of common stock, par value $100, of which 649 shares were *133 held by employees under the restrictive agreements, and 1,241 shares were held by members of the Katz family. The 649 shares of stock held by the employees were "sold" to them at book value, on credit, and were issued to them under restrictive agreements which, among other things, provided that: (1) Until fully paid for, the Corporation was to hold the stock as collateral 826 security, but the employee had the right to vote the stock and receive the dividends declared thereon; (2) the employee could not use the stock as collateral for loans, or sell it to anyone other than the Corporation; (3) upon termination of the employee's employment "for any reason whatever," he or his representative had to "sell" the stock back to the Corporation; (4) the Corporation was to pay for the stock, out of surplus, "a sum equal to the full book value of said stock computed as of the close of the fiscal period immediately prior to the termination of said employment, less any balance due and unpaid on said stock," in cash or, at the Corporation's option, in installments of 20 percent cash and the balance over a four-year period; (5) the book value computation was to be made by the Corporation *134 and did not include good will; and (6) the certificate of stock was to contain an endorsement that it was issued subject to the terms of the agreement. This type of shares will be referred to, hereafter, as Old Stock or Shares. After the decision of this Court in National Clothing Co. of Rochester, 23 T.C. 944 (1955), the Corporation's policy with respect to the sale of stock to employees, and the restrictive agreements with respect thereto, was changed. Thereafter: (1) The stock was "sold" to employees at a nominal value, instead of book value; (2) upon the termination of an employee's employment, his stock was repurchased by the Corporation at whatever price it was sold to him (less any unpaid balance thereon) plus the "increment" in value of that stock during the period the employee held the stock; (3) that "increment" was made up of the aggregate of the proportionate share of that stock in each of the annual undistributed earnings of the Corporation, from the year in which the employee acquired the stock up to the end of the fiscal year preceding the termination of employment, less any dividends thereon thereafter received by the employee; (4) the amount *135 thus determined was no longer to be paid out of surplus, and was payable in cash or, at the Corporation's option, in installments of 20 percent cash and the balance over a four-year period; and (5) items 1, 2, 3, and 6 of the Old Stock agreements, as denoted in the above description, were retained. This type of shares will be referred to, hereafter, as New Stock or Shares. On December 18, 1956, the shareholders voted to increase the capitalization of the Corporation from $189,000 to $567,000, consisting of 5,670 shares of stock, par value $100. Thereupon, a stock dividend of two shares was declared and distributed for each share of stock shown on the books of the Corporation to be issued and outstanding. Following issuance of this stock dividend, the shareholdings in the Corporation became: Employees - 1,275 Old Shares, and 390 New Shares; retiree - 15 Old Shares; and members of the Katz family 3,990 shares (which included 66 shares held by Eugene Katz under the restrictive agreements). As of December 31, 1955 (adjusted for the recapitalization), stock was held by the following individuals or groups in the following amounts: Shareholders
Number of Shares
1. Ruby E. Katz
300
2. Sidney L. Katz (decedent in this proceeding)
978
3. Other relatives of Sidney L. Katz
2,712
4. Employees of the Corporation not related to any of the above 1,680
TOTAL
5,670
*136 As of August 25, 1961, the Corporation's authorized capital consisted of 5,670 shares of capital stock, par value $100. As of that date, the stock was held by the following groups or individuals in the stated amounts: Shareholders
Number of Shares
1. By or for the benefit of rela- tives of Sidney L. Katz
2,712
2. Sidney L. Katz (decedent in this proceeding)
978
3. Employees of the Corporation not related to any of the above
1,425
4. The Katz Agency (Treasury Stock) 555
TOTAL
5,670
C. Sale of Ruby Katz Stock Ruby Katz died on March 18, 1959, owning 300 shares of stock of the Katz Agency, which she left in a testamentary trust with the income therefrom to her daughter of a prior marriage, Mrs. Jane Mohr, and the remainder to the latter's children. The Chemical Corn Exchange Bank (later changed to Chemical Bank New York Trust Company and hereinafter referred to as the "Chemical 827 Bank," or the "Bank"), and Joseph T. Melczer, Jr., of Arizona, qualified as coexecutors of the Ruby Katz Estate and as co-trustees of the aforementioned testamentary trust. The Chemical Bank is the sixth largest bank in the United States. It conducts a substantial trust *137 and estate business and has a personal trust department for the management of trusts and estates, comprised of about 73 officers and about 800 employees. It also has a securities analysis department consisting of some 20 officers and 40 research assistants. The personnel in these departments has increased about 10 to 15 percent since 1959-1961. On March 30, 1959, at the request of the Bank, the Katz Agency furnished balance sheets and income statements of the Corporation, as of the end of the years 1954-1958, inclusive, as taken from the books of the Corporation. This information was turned over to F. W. Anderson of the Bank's securities analysis department for an evaluation of the 300 shares of the Katz Agency stock in the Ruby Katz estate. The Bank's attorneys and trust committee, as well as the co-trustee, concluded that the Agency stock was not an appropriate investment for the trust estate and the trustees decided to dispose of the stock. Upon completion of his analysis in 1959, Anderson expressed the opinion on May 14, 1959, that: (1) A reasonable basis for negotiating the sale of the 300 shares would lie in the price range of $325-$400 per share; and (2) for estate tax purposes, *138 there was justification for a valuation of the stock at $285-$325 per share. On July 7, 1959, Chemical Bank's trust investment committee recommended that these 300 shares of stock of the Katz Agency be sold for a price in the neighborhood of $325 per share. From July 7, 1959, until May 1961, Chemical Bank's representatives from time to time attended stockholders' meetings of the Agency and kept themselves reasonably informed about the Agency's affairs. From July 7, 1959, until May 1961, Chemical Bank sought to sell the 300 shares of Katz Agency stock at the best possible price. Following the September 1959 Chemical Bank trust investment committee meeting, Chemical Bank sought an offer for the 300 shares of stock from the Katz Agency. In response to this request, the Katz Agency offered $200 per share for this stock. Thereafter and over the course of time, Chemical Bank obtained an offer of $225 per share for this stock from the Katz Agency. In February 1961, the Bank received the Corporation's income statement for 1960 which showed that its 1960 earnings were lower than its 1959 earnings. In March 1961, Chemical Bank learned that the Agency's quarterly dividend rate had been *139 cut from $10 per share to $5 per share. In addition, in March 1961, Chemical Bank learned that the Agency was losing the television representation of its largest client, Storer Broadcasting Company, and that it anticipated the loss of the radio representation for this client. At the same time, Chemical Bank learned that the Agency expected its earnings for 1961 to decline from the 1960 earnings level. In April or May of 1961, Chemical Bank advised George Katz, then Chairman of the Board of the Katz Agency, that, unless the Katz Agency offered a higher price for the 300 shares of stock, Chemical Bank expected to get an offer from the Gould Foundation at a price of $285 per share. The Katz Agency thereafter offered to purchase these 300 shares of Agency stock for a price of $290 per share. Chemical Bank accepted this offer and the 300 shares of Katz Agency stock were sold to the Agency in May 1961 for a price of $290 per share. The sale by the Chemical Bank of the 300 shares of Agency stock to the Agency was an arm's-length transaction. Chemical Bank had no connection with the Katz family or the Agency other than this transaction and no pressure was ever brought to bear to prevent *140 Chemical Bank from selling to an outsider. D. Business status of Agency Historically, the Katz Agency's period of most rapid growth coincided with the introduction of new communications media. In particular, the three periods of rapid growth in the Agency's history coincided with the commencement of its representation of newspapers, the introduction of radio broadcasting stations as clients in the 1930s, and the introduction of television broadcasting stations as clients in the late 1940s. By 1961, its business activities in these advertising media were distributed about 70 percent in television, about 15 percent in radio, and about 15 percent in newspaper representations. 828 The Corporation's business of exclusive national advertising representative for newspapers, radio, and television was generally confined: (a) In the case of newspapers, to the sale of advertising space, and (b) in the case of radio and television, to the sale of non-network time, to advertisers and agencies in the United States, other than in specifically named local territory of the particular client. The Corporation obtained customers for its clients primarily through product-advertising agencies *141 retained by the product manufacturers. Generally, a prduct-advertising agency received a commission from the Corporation's client for placing the advertising order with the client and the Corporation received a commission from the client based upon the net amount due the client after deducting the commission of the product-advertising agency. In the case of newspaper clients, the representation contract was usually for a period of three to five years at a specified flat rate of commission on the client's net amounts. In the case of radio and television clients, the contract was usually for a three-year (sometimes for an indefinite) period, with a downward scale of commissions as the amount of the contract increased, more fully described below. Either party had the right to terminate the contract on one year's notice. One of the clauses in the contracts with every client in all of the three advertising media provided for the billing and collection by the Corporation, at its own expense and without charge to the client, of all of the charges due the client for filling the advertising orders of the customers. When considered in conjunction with a provision of the contract wherein *142 the Corporation guaranteed payment by the 15th or 20th of the following month of all amounts due from the customers for commissionable orders filled by the client, this service resulted in the Corporation's factoring the clients' accounts receivable without charge. The amounts thus factored increased as the Corporation's business increased, from $3,187,508 at the end of 1954 to $6,203,801 at the end of 1961. Of five competitors of the Katz Agency contacted by respondent, only one offered to perform such billing and collection service, but at a charge therefor. Unlike those of its competitors, the Katz Agency broadcasting representation contracts provided for a downward scale of commission rates as the annual volume of spot time sales increased. This arrangement, hereinafter referred to as "regressive billing," consisted of two types: In one, the reduced commission rate was retroactively applied to all of the station's net billings; in the other, the reduced commission rate was applied only to the specified blocks of increased volume of sales. Thus, where the schedule of commission rates was, as set forth below: Annual Volume (]
Commission Rate
Up to 500,000
12 1/2 percent
750,000 to 1,000,000
10 percent
Over 1,000,000
7 1/2 percent
*143 and the annual volume of sales reached $1,200,000, the Corporation's commission, under the retroactive type, would be 7 1/2 percent on $1,200,000 or $90,000; while under the block type, it would be 12 1/2 percent on the first $500,000, 10 percent on the next $500,000, and 7 1/2 percent on the remaining $200,000, for a total of $127,500. The retroactive type was fully in effect in 1954, less so in 1955, about one-third in 1956, and in 1957 it was practically entirely replaced by the block type. Where a client owned more than one broadcast station (radio or television), the net billings of all of them were combined to determine the applicable regressive rate of commission. The Corporation's commission rates were uniformly applied to all of its clients and each of them was equally entitled to that regressive rate which the volume of its net billings warranted. In 1953, the Corporation initiated a qualified profit-sharing plan for the benefit of all of its employees. Under this plan, the Corporation contributed 30 percent of its annual net profits, before taxes, to a trust fund. The trustees allocated and credited the contributions to the accounts of the employees on a point basis, *144 determined by salary (1/2 point for each $500 of salary - maximum 30 points on $30,000 of salary) and length of service (1/3 point for each year of service - maximum 15 points for 45 years of service). Upon death, disability, or retirement (at 60), 100 percent of the amount credited to the employee's account was to be paid to him or his beneficiary. If severance occurred for any other reason before December 31st of the first year of employment, nothing was paid; if it occurred 829 during the first year after December 31st, 20 percent of the credited amount was paid; an additional 25 percent was paid for each additional year thereafter during which severance occurred; and if not occurred during the fifth year, or thereafter, 100 percent was paid. The plan was amended, as of January 1, 1959, increasing the maximum salary points to 60, based on salaries up to $60,000; and the plan was further amended, as of January 1, 1961, prolonging the vesting period to 10 years at the rate of 10 percent a year. A sales incentive plan was adopted by the Corporation on June 14, 1960, for the benefit of the line salemen only, to replace the usual Christmas bonus (two weeks pay) in order to create *145 a monetary incentive for the salesmen to increase their sales. Thereunder, an annual fund was created, the amount of which depended upon the relation of the gross profits of the year to the gross profits of 1959. If the gross profits of the year equalled that of 1959, the fund for that year was the amount which would have been distributed for sales incentive purposes in 1959 had the plan been in existence for that year. If the profit in any year was more or less than that of 1959, the fund was correspondingly increased or reduced. A committee decided, after considering the recommendations of the sales managers of the respective advertising media, how much each salesman was to receive from the fund. Thus, a diligent salesman could receive a year-end bonus far in excess of two weeks salary, and an indifferent salesman could receive much less than that amount. The "year" consists of the first 10 months of the current year and the last two months of the previous year, so that the distribution could be made at Christmas time. The amounts thus paid are considered compensation in computing the respective "salary" points under the profit-sharing plan. As of April 1, 1961, the Corporation *146 adopted a non-contributing qualified pension plan for the benefit of all employees, except salesmen covered by the sales incentive plan and temporary employees. It provides for a monthly retirement benefit at age 65 of 25 percent of an employee's monthly compensation in excess of $400, plus an insurance policy of $1,000 for every $10 of monthly benefit; and is funded by a level annual premium, Life-to-85 contract, plus a separate investment fund. The normal cost of the plan is based on a level premium payable over the remaining future service of each employee; and the first year's cost of the plan amounted to $107,246.87. The Agency depended for its effectiveness in serving its clients upon the personal relationship between its salesmen and the professional buyers of the advertising agencies. At the same time, the Agency depended upon its personnel and business reputation to acquire additional clients. As a member of a service industry, not selling a tangible product with particular attributes, the Agency could hope to retain clients only as long as it performed its job better or cheaper, or both, than its competition. Moreover, it was possible for the Agency's clients to perform *147 the service for themselves. As of August 1961, the Agency had sales offices in approximately 10 cities, with the main sales office of its western division in Chicago, and of its eastern division in New York City. Functionally, the Katz Agency was divided into five departments: (1) Newspaper (or "Print"); (2) Television; (3) Radio; (4) Research; and (5) New Business. During 1960, the Katz Agency lost the services of Abe Doris, then head of the Print Department, who had headed that department for almost 40 years. As of August 1961, George Katz (then 88) was the principal Agency contact with the newspaper clients, and Eugene Katz (in his 50s) was the principal contact with the broadcasting clients. While the Katz Agency was able to build a staff of experienced young management, it suffered from a turnover in its sales force, with the resulting loss of close customer relationship. This was a perennial problem, only partially mitigated by the profit-sharing plan instituted in 1953 and the sales incentive plan instituted in 1960. E. Financial Status of Agency The following are condensed balance sheets and income statements of the Katz Agency for the years 1954-1961, inclusive: *148 830 *13 KATZ AGENCY BALANCE SHEETS FOR PERIODS ENDING DECEMBER 31, 1954-1957, INCLUSIVE
1954
1955
1956
1957
Current Assets
Cash
$ 568,575
$ 279,840
$ 730,224
$ 612,637
U.S. Obligations
45,000
125,000
10,000
196,143
Acc. Receivable
3,187,508
4,171,232
4,744,501
5,129,694
Note Receivable 19,516
3,730
Total Current Assets
$ 3,820,599
$ 4,576,072
$ 5,484,725
$ 5,942,204
Less:
Current Liabilities 3,234,514
3,863,291
4,539,058
4,791,732
Net Working Capital$ 586,085
$ 712,781
$ 945,667
$ 1,150,472
Plus:
Investments, etc.
$ 76,340
$ 102,383
$ 105,262
$ 69,715
Other Receivables
161,148
161,763
128,402
122,650
Leasehold and Equipment, Net
116,466
108,551
116,449
111,019
Miscellaneous 11,030
10,979
541
18,891
Net Worth $ 951,069
$ 1,096,457
$ 1,296,321
$ 1,472,747 *13 KATZ AGENCY BALANCE SHEETS FOR PERIODS ENDING DECEMBER 31, 1958-1961, INCLUSIVE
1958
1959
1960
1961
Current Assets
Cash
$ 416,855
$ 884,031
$ 611,823
$ 700,336
U.S. Obligations
199,059
394,988
246,050
Acc. Receivable
5,874,140
6,792,281
6,400,037
6,203,802
Notes Receivable 9,089
14,533
225
63
Total Current Assets
$ 6,499,143
$ 7,690,845
$ 7,407,073
$ 7,150,251
Less:
Current Liabilities 5,188,658
6,150,387
5,740,801
5,299,037
Net Working Capital
$ 1,310,485
$ 1,540,458
$ 1,666,272
$ 1,851,214
Plus:
Investments, etc.
$ 65,805
80,846
75,342
69,813
Other Receivables
114,286
145,965
171,791
165,424
Leasehold and Equipment, Net
119,623
114,510
114,496
113,304
Miscellaneous 4,425
5,425
6,091
1,305
Net worth $ 1,614,624
$ 1,887,204
$ 2,033,992
$ 2,201,060
*149 *13 KATZ AGENCY INCOME STATEMENTS FOR PERIODS ENDING DECEMBER 31, 1954-1957, INCLUSIVE
1954
1955
1956
1957
Gross Billings
$33,653,270
$39,257,325
$48,530,876
$53,343,092
Less: Cost thereof
30,780,199
35,904,808
44,613,746
49,119,707
Net Commissions Earned
$ 2,873,071
$ 3,352,517
$ 3,917,130
$ 4,223,385
Operating Expenses 2,218,786
2,481,619
2,783,432
3,097,048
Net Operating Profit
$ 654,285
$ 870,898
$ 1,133,698
$ 1,126,337
Other Income 3,138
1,973
3,921
2,123
Gross Profit
$ 657,423
$ 872,871
$ 1,137,619
$ 1,128,460
Less:
Contribution to Profit-Sharing Plan
$ 197,730
$ 262,159
$ 297,700
$ 300,868
Contribution to Employees' Pension Trust
Federal Income Taxes 234,412
312,266
431,306
424,365
NET PROFIT $ 225,281
$ 298,446
$ 408,613
$ 403,227 831 *13 KATZ AGENCY INCOME STATEMENTS FOR PERIODS ENDING DECEMBER 31, 1958-1961, INCLUSIVE
1958
1959
1960
1961
Gross Billings
$57,503,889
$68,872,675
$68,026,978
$66,640,492
Less: Cost thereof 52,950,846
63,574,801
62,717,363
61,386,684
Net Commissions Earned
$ 4,553,043
$ 5,297,874
$ 5,309,615
$ 5,253,808
Operating Expenses 3,630,162
4,030,764
4,192,491
4,326,425
Net Operating Profit
$ 922,881
$ 1,267,110
$ 1,117,124
$ 927,383
Other Income 67,132
113,179
2,207
* 308,568
Gross Profit
$ 990,013
$ 1,380,289
$ 1,119,331
$ 1,235,951
Less:
Contribution to Profit-Sharing Plan
297,659
414,232
335,905
338,671
Contribution to Employees' Pension Trust
107,247
Federal Income Taxes 337,853
466,677
401,089
323,437
NET PROFIT $ 354,501
$ 499,380
$ 382,237
$ 466,596
*150 The Katz Agency also prepared comparative six-month statements for internal use. The following is the condensed income statement for the period January 1 - June 30, 1961 (compared to the same period in 1960): 1961
1960
Gross Profit
$680,831
$731,203
Contribution, Profit-Sharing
204,249
219,361
Federal Taxes 241,830
260,171
NET PROFIT $234,752
$251,671
During 1956, the Corporation declared and paid quarterly cash dividends, aggregating $105 per share, on the 1,890 shares of stock then authorized, issued, and outstanding. The stock dividend declared in 1956 became effective on January 2, 1957. Thereafter, for the years 1957 to 1961, inclusive, the Corporation declared and paid quarterly cash dividends on each of the then issued and outstanding shares of its authorized 5,670 shares of stock, as follows: Quarter
1957
1958
1959
1960
1961
1st
$10.00
$ 7.50
$10.00
$10.00
$ 5.00
2d
10.00
7.50
10.00
5.00
10.00
3d
10.00
7.50
10.00
10.00
10.00
4th 10.00
15.00
10.00
15.00
15.00
Total
$40.00
$37.50
$40.00
$40.00
$40.00
*151 The following is a schedule of the number of outstanding shares (adjusted for the recapitalization) and earnings per share of the Katz Agency as of December 31, 1954 - 1961: Shares Out-
Earnings Year
standing
Per Share
1954
5,670
$39.73
1955
5,670
52.64
1956
5,670
72.07
1957
5,670
$71.12
1958
5,670
62.52
1959
5,670
88.07
1960
5,490
69.64
1961
5,115
91.22 The 1961 earnings per share figure is distorted by the inclusion of a $300,000 payment made to the Agency on the cancellation of a representation agreement, and by the large amount of treasury stock. As a general rule, the Katz Agency did not retain treasury stock; rather, it distributed the stock to its employees as part of its incentive plan. Using 1954 as a base year, the following table represents the increase or decrease per year in gross billings and net profits from operations: Gross Bill-
Net Operat- Year
ings
ing Profit
1954 (Base Year)
$100.00
$100.00
1955
116.65
133.11
1956
144.21
173.27
1957
158.51
172.15
1958
170.87
141.05
1959
204.65
193.66
1960
202.14
170.74
1961
198.02
* 141.74
*152 Using 1956 as a base year, the following table represents the increase or decrease per year in gross billings and net profit from operations: Year
Gross Bill- ings
Net Operat- ing Profit
1956 (Base Year)
$100.00
$100.00
1957
109.92
99.35
1958
118.49
81.40
1959
$141.92
$111.77
1960
140.17
98.54
1961
137.32
* 81.80
Sometime prior to decedent's death, the Katz Agency learned that it would lose the representation of the four Storer Broadcasting Company television stations at the end of 1961, as Storer had decided to serve as representative for its own stations. The Storer television account represented approximately 15 percent of the Katz Agency's gross television billings in 1961, and over 10 percent of its earned commissions for 1960. The Agency retained representation of the Storer radio stations, although it expected to lose these in the future. Also effective in 1961, the Katz Agency lost representation of one station owned by the American Broadcasting Company, and one owned by Westinghouse, as *153 these corporations decided to enter the station representation field for themselves. On October 30, 1959, the Federal Communications Commissions adopted a rule prohibiting networks from serving as representatives of independent affiliated stations for the sale of non-network time ("national spot sales"). The Federal Communications Commission denied proposed modifications of the rule on April 13, 1960, and its order was affirmed on March 2, 1961. Metropolitan Television Co. v. F.C.C., 289 F. 2d 874 (C.A.D.C., 1961). As a result of the order, the television networks were required to release the 10 independent stations they represented. Prior to decedent's death, the Katz Agency acquired representation of three of these stations. No stock of any corporation engaged in the same or similar line of business as that of the Katz Agency was listed on any exchange at the date of the decedent's death, August 25, 1961, or during any period reasonably near that date. Ultimate Finding of Fact The fair market value of the 978 shares of Katz Agency stock held by decedent on the date of his death was $300 per share. Opinion Valuation of the stock of a closely-held corporation *154 poses at best a difficult question of fact. The problem is more difficult where, as here, both parties agree that there is no similar publicly-held corporation with which to compare the statistical data of the closed corporation. Nevertheless, it is our duty on the record before us to exercise our judgment as to "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. The Katz Agency is sales representative for newspapers, radio and television stations, representing as of August 25, 1961, the date of decedent's death, approximately 35 newspapers, 42 radio stations, and 43 television stations. The Corporation's business is highly competitive, and the number and quality of the Katz Agency's clients have fluctuated over the past years. Decedent owned 978 shares of Katz Agency stock on the date of his death. The balance of the outstanding stock was held by members of the Katz family or employees of the Corporation. *155 No "outsiders" have ever held stock in the Corporation. The 978 shares represented approximately 17 percent of the authorized stock of the Katz Agency. Petitioner attempts to support its valuation of the Katz Agency stock at $290 per share on two grounds: (1) A sale of 300 shares of stock on May 22, 1961, for $290 per share; and (2) the testimony of its expert witness that the fair market value of the stock declined to $275 per share by the date of decedent's death. Respondent attempts to support his valuation of the stock on the testimony of his expert witness that the fair market value of the stock was $800 per share. Additionally, respondent contends that petitioner has failed to prove that the fair market value of the stock was not $600 per share, as determined by respondent in his notice of deficiency. Petitioner's expert witness, arriving at a value of $275 per share, multiplied earnings by eight, and then discounted the result by 50 percent for lack of marketability of the investment, with corresponding loss of opportunity for capital gain transactions in the stock. Respondent's expert used a multiplier of 15.2, which, based upon his earnings figure, led to a value of $1,000 *156 per share, which he discounted by 20 percent to give 833 effect to the under-pricing which he thought would be necessary to effect an immediate sale, thus arriving at a value of $800 per share. The disparity in the two experts' opinions is explained principally by two factors: (1) their disagreement as to the base period to be used to analyze the Agency's earnings trend; and (2) their disagreement as to whether the facts that the stock to be valued is a minority interest in a familycontrolled corporation and is not readily salable should affect our determination. As to the first point, our findings detail the earnings history of the Katz Agency over the period 1954-1961, inclusive. Depending upon the base year chosen, one may view the corporate history as a period of great growth or of stabilization. Respondent bases his calculations on the period 1954-1960; petitioner bases its calculations on the period 1956-1960. We believe that the time period chosen by petitioner more correctly reflects the position of the Katz Agency as of the date of decedent's death. The testimony of petitioner's witnesses and the economic data relied upon by respondent's expert indicate that the *157 period 1949-1956 was a time of substantial growth in the television market. As of 1949, television billings accounted for 4.3 percent of the Katz Agency earnings. By 1954, the figure grew to 58.5 percent; by 1955, 63.4 percent; by 1956, 66 percent. In the period 1954-1956, increased television billings accounted for almost all of the increased Agency earnings. By the end of 1956, the Katz Agency had established its position in the television market, and no substantial increase in market share occurred in the period 1956-1961. Indeed, respondent's calculations indicate that the Agency held 13.7 percent of the television "spot sales" market by the end of 1956 - and that its market share was less in every succeeding year except 1957. [1] By 1956, the Agency's earnings had levelled off, and the years of phenomenal growth, attributable to the increase in television billings, had ended. Thus, we believe the year 1956 properly represents the beginning of a new cycle in the Katz Agency business. *158 Using 1956 as the base year, we note that the earnings did not increase over the period 1956-1960. Corporate earnings were higher than those of 1956 only in 1959, and dropped below the 1956 level in 1960. Accordingly, we believe that the inclusion of the 1954-1955 extraordinary growth period in his computations and the failure to give any weight to the lag in the Agency's 1960-1961 television business, viewing the Agency as a rapidly growing corporation rather than one which had reached a plateau, led respondent into error. Second, respondent would have us give no weight to the fact that petitioner's stock, not sold on any market, was a minority interest in a closely-held family corporation. Respondent argues that, since there was no actual market for the Katz Agency stock (presumably respondent means "fair market" since we may assume that a pool of buyers would exist at a price, say, of $10 per share), we must determine its "fair value" assuming a market therefor. On this theory, respondent removes from consideration all factors which would affect the price of the stock in the hypothetical market except the factors which, he says, affect the price of publicly-held stock. Essentially, *159 then, respondent has asked us to determine the "intrinsic value" of the decedent's stock, without regard to how this value would be treated in the market place. This is necessitated, respondent urges, to place stock of a closely-held corporation on a parity with stock of a hypothetically identical corporation sold in a public market. If we assume that the stock of the hypothetical publicly-held corporation sells at $1,000 per share, and that buyers and sellers are equally knowledgeable of the relevant facts, respondent takes the position that the fair value of the stock of a privately-held corporation must be the same. It seems clear, however, that an unlisted closely-held stock is less attractive to an investor than a similar stock, listed on an exchange, with ready access to the investing public. While in some very rare circumstances an unlisted stock of truly exceptional quality may not suffer from lack of marketability, see James Couzens, 11 B.T.A. 1040, 1163 (1928), in the generality of circumstances a 834 consideration of the marketability factor is necessary and appropriate *160 to a determination of fair market value. Accepting respondent's argument would read "market" out of the term "fair market value." We do not read the statute, or the regulations, or respondent's Rev. Rul. 59-60, 1959-1 C.B. 237, to require this sort of artificiality. See Central Trust Co. v. United States, 305 F. 2d 393, 405 (Ct. Cl., 1962); Estate of Irene de Guebriant, 14 T.C. 611, 619 (1950), reversed on other grounds sub nom. Claflin v. Commissioner, 186 F. 2d 307 (C.A. 2, 1951); Obermer v. Onited States, 238 F. Supp. 29 (D. Hawaii 1964); Worthen v. United States, 192 F. Supp. 727 D. Mass. 1961).[2]
*161 If further support is needed for our rejection of respondent's valuation theory, it may be found by analogy to the effect of restrictive agreements on the valuation of closelyheld stock. See Rev. Rul. 59-60, supra, at section 8. Restrictive agreements, effective during life as well as at the death of a shareholder, and reflecting a bona fide business arrangement, will be recognized in making estate tax valuations. The reason is simple - the seller cannot obtain a greater price, regardless of the intrinsic value of the stock. The same reasoning is applicable here. Thus, whether "marketability" is considered a factor in computing the proper multiple or a factor by which the multiple is discounted, it is clearly to be taken into consideration in determining the fair market value of decedent's stock. One highly significant consequence of what we have called respondent's "intrinsic value" theory is that it would require us to disregard completely the concededly arm'slength Ruby Katz estate sale of 300 shares of the Agency's stock for $290 per share in May 1961, only three months prior to decedent's death. Respondent's expert admitted that he gave the sale no weight in arriving *162 at his opinion. We regard the sale as most significant. The sale was preceded by a decision of Chemical Bank's trust committee, on advice of counsel, that the stock was not an appropriate investment for a trust and should be sold. This suggestion in itself indicates that one large potential market for the stock was not available - a factor which a willing buyer and seller would take into account. The sale was preceded by a thorough value analysis in May 1959 and October 1959 by the Bank's analysts; was preceded by nearly two years of effort by the Bank's extensive trust department to sell the stock to any purchaser that could be located; and was effectuated at $290 per share only after the Katz family members were informed that the Bank was prepared to sell the stock to an outsider at $285 per share. While ordinarily a single isolated sale is not entitled to much weight, we think the history of this sale and its admittedly bona fide, arm's-length character entitle it to the same careful consideration which we are convinced willing sellers and buyers would give it in arriving at a price for the stock. See Estate of Lillian May Schroeder, 13 T.C. 259, 263 (1949). Accordingly, *163 we think the fact that the stock to be valued was a minority interest in a small corporation dominated by a single family group is a factor which would depress the value of the stock. Since the absence of a ready market severely limits capital gains possibilities, a hypothetical willing purchaser would be required to look almost exclusively to dividends for a return on his investment. And the controlling family shareholders could easily freeze (or even lower) the dividend rate. Indeed, for the first quarter of 1961, only shortly before decedent's death, the dividend rate was cut from $10 to $5 per share, mainly because the Agency lost its representation contract with Storer Broadcasting Company. The stockholder pressure for a consistent dividend policy which characterizes publicly-held corporations may not exist in the case of closely-held corporations. These factors no doubt explain to a great extent Chemical Bank's difficulty in finding a purchaser and its ultimate decision to sell the Ruby Katz estate stock for $290 per share. In summary, our ultimate finding of a fair market value of $300 per share on the date of decedent's death is based on a 835 consideration of all the *164 relevant testimony, stipulations and exhibits. We do not attempt to state in detail the weight given to each factor. However, we have considered the Katz Agency's business history and the nature of the highly competitive service business in which it was engaged, including the fact that the Agency's income was derived almost exclusively from service activities. We have made our own analysis of the data relating to earnings, dividends, and book value. We have noted the downward trend of earnings in the five-year period, 1956 through 1960, and the continuation of the decline in the first six months of 1961, as well as the Katz Agency's failure to maintain its previous percentage of the national television business in 1960 and 1961. We have considered the age of the Katz Agency executive staff. We have taken into account the control of the Agency by the Katz family, the facts that the shares being valued represented a minority interest, that the stock was unlisted, and that capital gains possibilities were extremely limited. We have given weight to the arm's-length Ruby Katz stock sale at $290 per share. We have reviewed the nature of the markets serviced by the Katz Agency, and the growing *165 likelihood of competition, as well as the costly incentive plan adopted by the Agency to retain key employees and salesmen. We have considered the continued growth of the television and radio industries. We have considered the fact that about 80 percent of the Agency's assets were accounts receivables. We have considered the testimony of the experts for both parties. On the basis of these factors, and others, and exercising our own judgment, we have concluded that the fair market value of the Katz Agency stock held by decedent on the date of his death was $300 per share. Decision will be entered under Rule 50. Footnotes
*. In 1961, the Katz Agency received $300,000 on the cancellation of a representation agreement which it reported as "other income."↩
*. If the $300,000 received by the Katz Agency on cancellation of a representation contract in 1961 is considered as profit from operations, the 1961 figure is $187.59.↩
*. If the $300,000 received by the Katz Agency in 1961, noted above, is considered as profit from operations, the 1961 figure is $108.26.↩
1. Respondent's expert calculated the Agency's market share as follows: ↩
Market
Market
Share
Share Year
(%)
Year
(%)
1954
13.1
1958
13.2
1955
13.2
1959
13.6
1956
13.7
1960
12.3
1957
14.3
1961
11.9
2. If respondent's theory were correct, an estate might well find itself in the position where the taxing authorities have placed a value on its stock leading to an estate tax it could not pay by selling all the stock on the market. Here, for example, respondent argues that the Katz Agency stock had a value of $800 per share despite the fact that Chemical Bank as trustee tried for nearly two years to sell the Ruby Katz estate stock and the best price it could get in an admittedly arm's-length transaction was $290 per share. In these circumstances, under respondent's theory the estate tax (where the estate does not qualify for the marital deduction) would exceed the price obtainable for the stock if the effective tax rate on the inclusion were as high as 37 percent. We do not think the Congress ever intended such a result.↩